Loretta L. CLEESE, Plaintiff,

v.

HEWLETT–PACKARD COMPANY, Defendant.

No. CV–94–1253–ST.

United States District Court, D. Oregon.

Dec. 21, 1995.

**1314**

Lynda J. Hartzell, Brownstein Rask Sweeney Kerr Grim & Desylvia, Portland, OR, for Loretta L. Cleese.

Roxanne A Leidholdt, Stoll Stoll Berne Lokting & Shlachter PC, Portland, OR, Dennis Gladwell, Gibson Dunn & Crutcher, Irvine, CA, for Hewlett–Packard Company.

OPINION AND ORDER

STEWART, United States Magistrate Judge:

### INTRODUCTION

Plaintiff Loretta L. Cleese ("Cleese") brings this action against her former employer, defendant Hewlett–Packard Company ("Hewlett–Packard"), alleging pregnancy discrimination and sexual harassment under 42 USC § 2000e ("Title VII") (Counts I & II); violation of the Americans with Disabilities Act ("ADA") (Count III), 42 USC § 12101; and intentional infliction of emotional distress (Count IV). This court has jurisdiction pursuant to 28 USC § 1331.

Now before this court is Hewlett–Packard's motion for summary judgment (docket # 18) against all claims.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

### UNDISPUTED FACTS

Cleese worked in Hewlett–Packard's Ink–Jet Components Division in Corvallis, Oregon, from June 1992 until May 14, 1993. Prior to her move to Oregon, Cleese had worked from February 1989 until April 1992 at Hewlett–Packard's Optical Communication Division in San Jose, California.

Hewlett–Packard requires its employees to conform to "dependability guidelines." These guidelines include a 5% Flexible Time Off ("FTO") guideline which requires an employee to miss no more than 5% of available time (approximately one day per month), except for jury duty, vacation, a funeral or a leave of absence. Further time off is leave without pay ("LP") and only with a supervisor's permission. Personal and medical leaves of absence are available. While at the San Jose plant, Cleese's FTO figure was often at unacceptably high levels, which resulted in low "dependability" ratings in her performance evaluations.

When she left the San Jose plant in April 1992, Cleese knew that her FTO was exhausted or close to being exhausted. After moving to Oregon, Cleese began work in the clean room at the Corvallis plant in June 1992. At that time, she informed Hewlett–Packard that she was trying to become pregnant.

Cleese left work two hours early on June 17 due to illness; missed work on June 23 for a doctor's appointment; and was ill on June 24. It is disputed whether she obtained prior approval for taking time off on June 24. Thereafter, on July 1, 1992, Cleese received a verbal warning for unacceptable attendance based on the 2½ days of work she missed in June 1992. She was warned that she could be terminated if she failed to follow all dependability guidelines.

On October 27, 1992, Cleese received a "Written Warning" that her "performance was unacceptable" in the areas of judgment and dependability. It mentioned that Cleese had taken off September 8 for reasons not agreed to by management, showing "unacceptable performance in the area of judgment." It further noted that Cleese had been late for work on October 9[1] and 26, demonstrating "unacceptable behavior in the area of dependability." Cleese was warned that in future she must be prompt for work, not take any unapproved LP, and that her "communication to all members of the management team must be done with complete accuracy."

On December 2, 1992, Hewlett–Packard circulated the results of a health study performed by the Semiconductor Industry Association ("SIA"). The study found that women who worked in semiconductor fabrication facilities (clean rooms) had an increased rate of miscarriages and took longer to conceive than women who did not work in such areas. The memo detailing these results stated that "[g]lycol ethers ... are the suspected cause, although it's difficult to pinpoint them because they are used along with other chemicals in these fab areas." The memo specifically noted that "the Corvallis site does not use glycol ethers in any of its manufacturing processes," and concluded by stating that "women employees working in fab areas who are either pregnant or trying to conceive should consult with their managers to discuss any health concerns."

On December 14, 1992, Cleese asked her supervisor if she could be transferred out of the clean room because she was undergoing fertility treatment and was concerned by the results of the SIA study. Her supervisor offered her a job in the drill room. Although Cleese indicated that she wished to work another shift, she eventually turned down the job in the drill room due to her back restrictions from a prior injury at the San Jose plant. Because her supervisor was unaware of any restrictions, Cleese was placed on probation on December 22, 1992, for "integrity" and "judgment" concerns. Her previous back injury was later confirmed and her restrictions reinstated.

---

1. Cleese denies that she was late for work on this date.

Because Cleese's restrictions precluded her from working in the drill room, she remained in the clean room. Once she was placed on probation, Hewlett–Packard disciplinary rules denied her the opportunity to transfer to another department for six months.

During her employment at the Hewlett–Packard Corvallis plant, Cleese was subjected to offensive comments by her co-worker, Steve Ciarla ("Ciarla"). Cleese complained of Ciarla's sexual harassment to her supervisor in mid-April, 1993.

Also in April 1993, Cleese learned she was pregnant. Shortly thereafter, Hewlett–Packard management received complaints from three employees that Cleese was not performing the laminating aspect of her job and claiming that she had restrictions to prevent her from working around chemicals. Although Cleese denied these allegations, Hewlett–Packard placed her on leave without pay pending investigation. Cleese subsequently obtained a note from her doctor restricting her from working around toxins for the duration of her pregnancy. However, Hewlett–Packard terminated her on May 15, 1993, citing her failure to be truthful with her co-workers and management concerning her restrictions.

### STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* at 1468.

### DISCUSSION

**I.** **Pregnancy Discrimination Under Title VII (Count I)**

In 1978, Congress amended Title VII by enacting the Pregnancy Discrimination Act which provides in relevant part:

The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work.

42 USC § 2000e(k). The Act clarified that "for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 684, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983).

A plaintiff can prove an employer's unlawful Title VII discrimination under either of two theories. A disparate impact theory involves a "facially neutral employment criterion that has an unequal effect on

members of a protected class." *Sischo–Now-nejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 (9th Cir.1991). A disparate treatment theory, on the other hand, involves intentional discrimination on the basis of race, color, religion, sex, or national origin. *International Bhd. of Teamsters v. United States ("Teamsters"),* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Sischo–Nownejad,* 934 F.2d at 1109. "Proof of discriminatory motive is critical" to a claim of disparate treatment. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

■ Cleese's claim is based exclusively on a theory of disparate treatment. In order to prove disparate treatment, Cleese "may establish a *prima facie* case by introducing evidence that 'give[s] rise to an inference of unlawful discrimination.'" *Sischo–Nownejad,* 934 F.2d at 1109, quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). She may meet this burden by demonstrating that (1) she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment decision; and (4) she was treated differently than other persons outside her protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Sischo–Nownejad,* 934 F.2d at 1109; *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 672 (9th Cir.1988). In a summary judgment motion, the court must view the facts in the light most favorable to the nonmovant (Cleese), and the amount of evidence which she is required to produce to create her *prima facie* case is "very little." *Sischo–Nownejad,* 934 F.2d at 1111. Once Cleese has established her *prima facie* case, the burden then shifts to Hewlett–Packard "to articulate a legitimate, nondiscriminatory reason for the challenged action. If [it] does so, then the burden returns to [Cleese] to prove that the articulated reason is pretextual." *Id.* at 1109.

## A. *Prima Facie Case*

### 1. *Protected Class*

■ The Pregnancy Discrimination Act ("PDA") prohibits discrimination on the basis

of "pregnancy, childbirth, or related medical conditions...." 42 USC 2000e(k). Cleese claims that she belonged to the intended protected class under the PDA during the entire term of her employment with Hewlett–Packard in Corvallis, even though she did not actually become pregnant until shortly before her termination. The Ninth Circuit has not yet considered whether women who are attempting to become pregnant are also protected from discrimination under the PDA.

Cleese relies on *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393, 1401 (N.D.Ill.1994), for the proposition that the PDA protects women who are attempting to become pregnant. In *Pacourek,* the plaintiff was unable to become pregnant naturally and was undergoing *in vitro* fertilization treatments. Pacourek's employer allegedly discriminated against her by applying a sick leave policy not applied to other employees, expressing his doubts about her ability to handle pregnancy and a career, and informing her that her intended pregnancy was "a problem." *Id.* at 1401. The court relied primarily on Congressional intent in holding that the employer's discriminatory treatment of Pacourek "based on intended or potential pregnancy is covered by the PDA." *Id.*

Hewlett–Packard, on the other hand, cites the subsequent decision of *Krauel v. Iowa Methodist Medical Ctr.,* Civil No. 4–93–10815, 1995 WL 652430 (S.D.Iowa 1995). *Krauel* held that a health insurance plan which excludes coverage for infertility treatment does not violate the PDA because infertility affects both men and women and is therefore gender-neutral. However, *Krauel* did not reject *Pacourek* outright. In fact, *Krauel* noted that although *Pacourek* granted PDA coverage to an infertile woman, the defendant there "did not specifically contend that its policy was one of gender-neutral discrimination against infertile workers," as did the defendant in *Krauel. Id.*

While infertility may well be gender-neutral, the ability to become pregnant clearly is not. Cleese's claim parallels that of *Pacourek* in that she alleges that Hewlett–Packard discriminated against her because it knew

that she was planning to become pregnant and probably would become so in the near future.

This court agrees with *Pacourek* that the purpose of the PDA is best served by extending its coverage to women who are trying to become pregnant. As noted above, the Supreme Court has equated discrimination on the basis of pregnancy with discrimination based on sex. *Newport News, supra,* 462 U.S. at 684, 103 S.Ct. at 2631. Further, it has recognized that a woman's ability to become pregnant may subject her to disparate treatment. *International Union, United Auto., Aerospace and Agric. Implement Workers of Am., UAW v. Johnson Controls,* 499 U.S. 187, 197, 111 S.Ct. 1196, 1202, 113 L.Ed.2d 158 (1991) (holding that employer's fetal protection policy violates Title VII because "[f]ertile men, but not fertile women, are given a choice as to whether they wish to risk their reproductive health for a particular job.").

The legislative history of the PDA supports this view. As pointed out in *Pacourek:*

Senator Harrison Williams, the chief sponsor of the Senate bill leading to the PDA, stated in floor debate that "[b]ecause of their *capacity to become pregnant,* women have been viewed as marginal workers not deserving the full benefits of compensation and advancement.... In some of these cases, the employer refused to consider women for particular types of jobs on the grounds that they *might become pregnant.*" Senator Williams continued, "[T]he overall effect of discrimination against women because they *might become pregnant,* or do become pregnant, is to relegate women in general, and pregnant women in particular, to a second-class status...." Representative Ronald Sarasin, a House bill manager, expressed a similar sentiment when he remarked that the PDA gives a woman "the right ... to be financially and legally protected *before,* during, and after her pregnancy."

*Pacourek,* 858 F.Supp. at 1402 (citations omitted) (emphasis added by *Pacourek* court).

■ A claim under the PDA requires that the employer discriminate against the employee *because of* her pregnancy. It seems to this court that if the employer has the requisite intent to discriminate against an employee because she is currently pregnant or is planning to become so in the near future, it does not matter if she has actually physically conceived at the time of the discrimination.

It is simply common sense to recognize that an employer may treat a female employee differently when it knows that she can or will become pregnant. Although Cleese did not actually learn of her pregnancy until April 1993, a month before her termination, she indicated to her supervisor at the time of her hiring in June 1992 that she was planning to become pregnant. The fact that Hewlett–Packard knew that Cleese was actively trying to conceive allows the inference that it may have treated her differently because of that fact. Under these circumstances, there is no reason not to extend protected class status to Cleese. Therefore, all acts occurring during Cleese's employment in Corvallis are placed at issue in her Title VII claim.

### 2. *Job Performance*

■ The second element of the *prima facie* case requires evidence that Cleese was performing her job in a satisfactory manner. Hewlett–Packard argues that Cleese's job performance was unsatisfactory as evidenced by the disciplinary actions based on dependability, integrity and judgment. In response, Cleese argues that the actual performance of her job was satisfactory, and that disciplinary actions were taken against her for her ancillary behavior in a discriminatory manner. Because Cleese was never reprimanded for the quality of her work, she satisfies the second element of her *prima facie* case.

### 3. *Adverse Employment Decision*

The third element of Cleese's *prima facie* case—that she suffered an adverse employment decision—is easily met. Cleese was suspended without pay on April 30, 1993, and terminated on May 15, 1993.

### 4. *Differential Treatment*

Finally, Cleese must show that she was treated differently than other persons outside her protected class. Based on records provided by Hewlett–Packard, Cleese argues that the dependability guidelines were enforced against her, but were not enforced against other non-pregnant employees. In particular, she notes that 30 of the 83 employees, for whom records were provided, were absent from work more than 15 hours per month, almost twice their available FTO. Of those 30, eight employees showed significant deviation from the policy. Yet none of these employees were warned or disciplined for failing to follow the dependability guidelines during Cleese's employment.

However, as explained by Hewlett–Packard, Cleese's argument rests upon a fundamental misunderstanding of the FTO policy. It appears that it is only unplanned FTO (even if FTO is available) or time off without available FTO that triggers discipline. As demonstrated by Hewlett–Packard's charts, in comparison with the eight employees cited by Cleese, Cleese was the only employee in 1992 who remained at or below zero in available FTO. Therefore, unlike the other eight employees, she properly was subject to discipline under the dependability guidelines for taking time off in 1992 without available FTO. In 1993 Cleese, as the other eight employees, maintained her available FTO above zero and was not disciplined during that time period for failing to comply with dependability guidelines. Instead, her discipline in 1993 related to other issues. Accordingly, Cleese's reliance on Hewlett–Packard's records to prove differential application of the FTO policy is misplaced.

However, Cleese also points to direct evidence that Ciarla, another employee, was treated more favorably than she. Although Ciarla took 88 consecutive hours of unapproved and unplanned LP in November 1991, he was given only a written warning, the same disciplinary action Cleese received for taking one day of approved LP and being eight minutes late for work. Cleese points to the "Application Examples" to argue that Ciarla should have received probation instead of merely a written warning. Hewlett–Packard counters this claim of differential treatment by stating simply that Ciarla was disciplined for his use of unplanned FTO. Hewlett–Packard does not respond to Cleese's allegation that Ciarla was treated more favorably than Cleese (or conversely, that Cleese was treated more harshly than Ciarla). It is possible that there was no differential treatment in Hewlett–Packard's discipline of Cleese and Ciarla. However, Hewlett–Packard has not adequately countered Cleese's allegation.

For purposes of summary judgment, this court must examine the facts in the light most favorable to Cleese. Absent any facts to refute Cleese's claim that she was treated differently than Ciarla, an employee not within the protected class, Cleese has stated a *prima facie* case of disparate treatment at this juncture.

### B. *Non–Discriminatory Reason*

The burden then shifts to Hewlett–Packard to "articulate a legitimate, nondiscriminatory reason for the challenged action." *Sischo–Nownejad*, 934 F.2d at 1109. Hewlett–Packard argues that Cleese's work history demonstrates that she had difficulty managing her schedule and being truthful with management. Cleese concedes that these are legitimate concerns for an employer. Thus, there is evidence to support Hewlett–Packard's disciplinary actions against Cleese.

### C. *Pretext*

The burden returns to Cleese "to raise a genuine factual issue as to whether [Hewlett–Packard's] articulated reason was pretextual." *Id.* at 1110. The Ninth Circuit has stated that summary judgment is usually inappropriate at this stage:

> Even if the defendant articulates a legitimate, nondiscriminatory reason for the challenged employment decision, thus shifting the burden to the plaintiff to prove that the articulated reason is pretextual, summary judgment is normally inappropriate. "[W]hen a plaintiff has established a *prima facie* inference of disparate treatment through direct or circumstantial evidence of discriminatory intent, he will *nec-*

*essarily* have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision." Specifically, in evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her *prima facie* case. When that evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment.

*Id.* at 1111 (citations omitted) (emphasis added by Ninth Circuit).

Cleese's evidence of pretext is the suspicious timing of her termination. She informed her supervisor in mid-April 1993 that she was pregnant; was placed on unpaid leave on April 30, 1993; and was terminated on May 15, 1993. The fact that she was terminated approximately one month after her pregnancy became known to Hewlett–Packard is sufficient to raise a question concerning Hewlett–Packard's motives in terminating her. "[T]he question of an employer's intent to discriminate is a 'pure question of fact.'" *Id.*, quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir.1985).

The Ninth Circuit has stated that it "require[s] very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the fact-finder, upon a full record." *Id.* Cleese has presented enough evidence to give rise to the inference that Hewlett–Packard may have treated her differently than its non-pregnant employees. Whether Hewlett–Packard did in fact unlawfully discriminate against her is a question for the jury.

## II. *Sexual Harassment Under Title VII (Count II)*

Cleese has two claims for sexual harassment under Title VII. She argues that comments by her co-worker Ciarla were suffi-

cient to create a hostile working environment. Although not specifically alleged, she also claims that her discharge only a few weeks after her complaint to management of Ciarla's behavior was retaliatory.

### A. *Hostile Working Environment*

 To prevail on a claim for "hostile work environment" sexual harassment under Title VII, Cleese must show that (1) she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that this conduct was unwelcome; and (3) that it was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir.1991). Factors to be considered when determining if a hostile environment exists are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, — U.S. —, —, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). "'[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.*, at —, 114 S.Ct. at 370.

 Cleese argues that it is a question of fact for the jury whether a reasonable woman would find that Ciarla's offensive comments created a hostile working environment. However, it is often appropriate to resolve the issue on summary judgment if it is clear from the facts that the offensive behavior alleged is legally insufficient to rise to the level of sexual harassment. *See, e.g., Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588 (9th Cir.1992); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531 (10th Cir. 1995); *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir.1995). Such is the case here.

For a hostile work environment to fall under Title VII, the harassment must be sexual in nature. Several of the comments which Cleese finds offensive were not of a

sexual nature. For instance, Ciarla called Cleese his "spandex queen" a couple of times. Deposition of Loretta Cleese ("Cleese depo"), p. 61. At the time he made these comments, Cleese was wearing a lab coat which came down below her knees, so he was only commenting on the area between her knees and her ankles. Ciarla's comments were apparently directed not at Cleese sexually, but only at the type of clothing she wore. As Cleese complained in her deposition: "[H]ow come I'm always wearing spandex, don't I have any other clothes." Ciarla also called Cleese "Hot Lips," on "very few" occasions. Cleese understood this to be a reference to the M*A*S*H character because Cleese's name is Loretta,[2] and not as a sexual comment.

Ciarla did make two comments which were sexual in nature. Upon learning that Cleese was pregnant, Ciarla commented on the size of her breasts by stating that "the baby's sure going to have a mouthful." On another occasion, Ciarla commented that women in the lab area were inferior. These "mere offensive comments," *Harris, supra,* objectionable as they may be, are not sufficiently severe or pervasive so as to have altered the conditions of Cleese's working environment.

Because Cleese has not shown that she was subjected to unwelcome sexual comments sufficient in severity or frequency to have altered the conditions of her working environment, her hostile environment claim must fail.

### B. *Retaliatory Discharge*

 It is also unlawful to retaliate against an employee because she has taken action to enforce rights protected under Title VII. 42 USC § 2000e-3(a). To establish a *prima facie* case of discriminatory retaliation, Cleese must show that: (1) she engaged in an activity protected under Title VII; (2) Hewlett–Packard subjected her to an adverse employment action; and (3) there was a causal link between the protected activity and Hewlett–Packard's action. *Miller v. Fairchild Indus.,* 797 F.2d 727, 731 (9th Cir. 1986). Once Cleese has established her *prima facie* case, the burden shifts to Hewlett–

Packard to show a legitimate, non-retaliatory explanation for the action. *Id.* To satisfy this burden, Hewlett–Packard "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.,* quoting *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095. The burden then shifts back to Cleese to show that Hewlett–Packard's proffered explanation is merely a pretext for discrimination. *Id.*

 Cleese has established the first two elements of a *prima facie* case of retaliatory discharge: Cleese's complaint to her supervisors about Ciarla's inappropriate comments constituted a protected activity, and she was subsequently terminated from her employment with Hewlett–Packard. At issue is whether she has provided evidence sufficient to warrant the inference that her discharge was causally related to her protected activity.

Cleese complained to her supervisor about Ciarla's comments in mid-April of 1993. Within the next two weeks, Ciarla complained to management about Cleese's refusal to laminate because she could not work around chemicals. Cleese was sent home on leave without pay on April 30, 1993, and was terminated on May 15, 1993. The timing of her discharge alone is sufficiently suspicious to create an inference that Cleese's sexual harassment complaint may have precipitated her discharge. Cleese has therefore fulfilled her burden to establish a *prima facie* case of retaliation.

The burden then shifts to Hewlett–Packard who supports its decision to terminate Cleese by pointing to her history of dependability and integrity problems. It asserts that Cleese was first given a verbal warning about her behavior, then a written warning, and finally placed on probation in December 1992. By refusing to perform an aspect of her job for which she had not yet provided verifiable restrictions, Hewlett–Packard asserts that Cleese violated the terms of her probation and was subject to discharge. Assuming *arguendo* that this is a sufficient explanation of Hewlett–Packard's actions

---

**2.** The character of Margaret "Hot Lips" Houli- han was portrayed by actress Loretta Swit.

against Cleese, the burden shifts back to Cleese to raise a genuine factual question whether Hewlett–Packard's stated reason is in reality a mere pretext.

As discussed above, Cleese relies primarily on the suspicious timing of her discharge to support an inference that Hewlett–Packard's stated reason for terminating her is pretextual. "Courts have recognized that in discrimination cases, an employer's true motivations are particularly difficult to ascertain, thereby making such factual determinations generally unsuitable for disposition at the summary judgment stage." *Miller*, 797 F.2d at 732–33 (citations omitted). Hewlett–Packard's true reasons for terminating Cleese "present an 'elusive factual question' that is incapable of resolution on summary judgment." *Id.* at 733 (citations omitted). Cleese's retaliatory discharge claim therefore survives this motion.

### III. *Violation of the Americans With Disabilities Act (Count III)*

Because Cleese has withdrawn her claim for violation of the ADA, this court need not address it.

### IV. *Intentional Infliction of Emotional Distress (Count IV)*

■ To state a claim for intentional infliction of emotional distress, Cleese must prove that: (1) Hewlett–Packard intended to inflict severe emotional distress on her; (2) Hewlett–Packard's conduct did in fact cause her to suffer severe emotional distress; and (3) Hewlett–Packard's conduct involved some extraordinary transgression of the bounds of socially tolerable conduct. *Lathrope–Olson v. Oregon Dep't of Transp.*, 128 Or.App. 405, 408, 876 P.2d 345, 346 (1994).

■ Cleese's claim for intentional infliction of emotional distress is not tied to her sexual harassment claim, but instead relates to her pregnancy discrimination claim. She claims that Hewlett–Packard committed "extraordinary transgression[s] of the bounds of

socially tolerable conduct" when it: (1) returned her to the clean room after she could not perform her assigned job in the drill room because of medical restrictions; (2) failed to look for another job for her outside the clean room knowing that she wanted to get pregnant and that the clean room potentially decreased her ability to conceive; (3) failed to reassign her after she was pregnant despite reported health risks of higher miscarriage rates with women who worked in clean rooms; (4) used probation as an excuse not to reassign her from the clean room, using the clean room as "a form of discipline"; and (5) told Cleese her continued use of fertility medication could lead to termination.[3]

Cleese argues that it is a factual issue for the jury whether Hewlett–Packard's conduct transgressed the bounds of socially tolerable conduct, citing two recent Oregon cases which reversed summary judgments for the employer. Contrary to Cleese's assertion, however, the Ninth Circuit recognizes that summary judgment is proper if the claim cannot "reasonably be regarded as so extreme and outrageous as to permit recovery." *Schneider v. TRW*, 938 F.2d 986, 992 (9th Cir.1991), quoting *Trerice v. Blue Cross*, 209 Cal.App.3d 878, 883, 257 Cal.Rptr. 338 (1989).

Cleese fails to offer any evidence to show either that Hewlett–Packard intended to inflict emotional distress or that Cleese in fact suffered severe emotional distress, both of which are required for this claim to survive. Cleese apparently assumes that Hewlett–Packard's conduct alone is sufficient to show its intention. However, Hewlett–Packard's conduct is far from outrageous, as is easily seen by a comparison with the cases cited by Cleese.

*Lathrope–Olson, supra,* involved a Native American woman whose supervisor called her "squaw," told her that "a squaw was supposed to walk behind her man," and stated that "all women were good for was between their legs." The supervisor threat-

---

3. Actually, Cleese's supervisor warned her that she could be terminated if her continued use of fertility medication "result[ed] in lost time from [her] work station during [her] normal work hours." Affidavit of Roxanne Leidholdt in Sup-

port of Hewlett–Packard's Reply Brief, Exhibit P. The unapproved time off would form the basis for her termination, not the use of fertility medication itself.

ened to push Lathrope–Olson into the path of oncoming vehicles and repeatedly locked her out of the crew van when it was raining or snowing and no other shelter was near. *Lathrope–Olson,* 128 Or.App. at 407, 876 P.2d at 346.

In *Mains v. II Morrow,* 128 Or.App. 625, 877 P.2d 88 (1994), Mains was subjected to daily assaults from her supervisor, Berry. Berry physically harassed Mains, shoving her, grabbing her ankles, and blocking her from entering her car. He made comments such as "lick my balls," called Mains a "snippy bitch," "wench," and "sex-atary," and told her she was "just another worthless woman." He encouraged the other men in the office to treat her in the same manner. When a co-worker touched Mains' breast "in a harassing manner," Berry "trivialized it and took no action." *Id.* at 628, 877 P.2d at 89–90.

Hewlett–Packard's conduct in refusing to transfer Cleese from the clean room in no way approximates the egregious behavior in these two cases, and is simply not "an extraordinary transgression of the bounds of socially tolerable conduct."

Further, Cleese has offered no evidence that Hewlett–Packard intended to cause Cleese any emotional distress. In fact, there is every indication that Hewlett–Packard did not believe that Cleese was at risk in the clean room. The SIA study twice emphasized that the suspected toxin, glycol ether, was not used at the Corvallis facility, and the note from Hewlett–Packard's doctor recommended that Cleese be transferred from the clean room only because of her concern, "not due to true risk." Hewlett–Packard's attempt to transfer Cleese to the drill room was done merely to accommodate her fears rather than to actually remove her from harm.

Because Cleese has failed to prove any of the required elements for her claim of intentional infliction of emotional distress, it cannot survive summary judgment.

### *ORDER*

For the reasons set forth above, defendant's motion for summary judgment (docket # 18) is GRANTED as to Cleese's claims of hostile work environment (part of Count II) and intentional infliction of emotional distress (Count IV), DENIED as to her remaining claims for sex/pregnancy discrimination (Count I) and retaliatory discharge (part of Count II), and DENIED AS MOOT as to her claim for violation of the ADA (Count III), which has been withdrawn.