**Rochelle SAKS, Plaintiff,**

v.

**FRANKLIN COVEY CO. and Franklin Covey Co. Client Sales, Inc., Defendants.**

**No. 99CIV.9588 (CM)(LMS).**

United States District Court, S.D. New York.

Oct. 2, 2000.

Darnley Dickenson Stewart, Bernstein Litowitz Berger & Grossman LLP, New York, for Rochelle Saks, plaintiffs.

Amy J Beech, Epstein, Becker & Green, New York, NY, Steven C. Bednar, Alan C. Bradshaw, Manning Curtis Bradshaw & Bednar LLC, Salk Lake City, UT, for Franklin Covey Co., defendants.

MEMORANDUM DECISION AND OR-
DER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDG-
MENT AND DENYING PLAIN-
TIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

McMAHON, District Judge.

Infertility blights the lives of thousands of American families.  Fortunately, mod-

ern medicine has devised ways that enable some of those who suffer from infertility to conceive biological children and carry them to term. Like so many of the extraordinary advances in medicine, these treatments are quite expensive. It is a testament to the basic nature of the reproductive drive that people who are desperate to have children will go to great lengths to conceive—often enduring extreme physical discomfort and incurring expenses that bring them close to bankruptcy. The physical discomforts are, of course, unavoidable. Whether the financial discomfort can be avoided by one family, at least, is the central issue in this case.

From March 1995 through October 1999, plaintiff Rochelle Saks was employed by defendant Franklin Covey, a seller of products and services related to time management, organization and business communication training. During that period, plaintiff and her husband were endeavoring to have a child. Saks and her husband had numerous treatments, prescribed by two different doctors, to enable her to conceive and carry a child, including a regimen of clomiphine ("Clomid") and progesterone and intrauterine insemination ("IUI"), which were unsuccessful. She also completed two cycles of in vitro fertilization ("IVF"), in April 1999 and August 1999. She became pregnant three times between September 1997 and August 1999. All three pregnancies ended in miscarriages.

Saks made claims for insurance reimbursement for her treatments. For purposes of this motion, defendants concede that plaintiff suffered from the condition

known as infertility and that all of the treatments prescribed to help her become pregnant, including in vitro fertilization and intra-uterine implantation, were "medically necessary" as that term is defined in Franklin Coveys' self-insured health benefits plan.[1] Ms. Saks' surgical fertilization procedures, which were rendered by American medical professionals, qualify as "a service required for the treatment of an active illness" (that illness being the inability to conceive a child in the usual way).

Nonetheless, Franklin Covey has declined to cover the cost of those procedures. Its insurance Plan specifically excludes coverage for "surgical impregnation procedures," including artificial insemination and in vitro fertilization. Saks contends in this lawsuit that this exclusion violates three separate Federal statutes: The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.;* and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). She also contends that the exclusion violates the New York Executive Law § 296 ("the New York Human Rights Law"), and that Franklin Covey has breached its contractual relationship under the Plan by declining coverage, not only for the surgical procedures, but for other medical services relating to her failed pregnancies. After discovery, both parties have moved for summary judgment—defendants for dismissal of the complaint, plaintiff for partial summary judgment on the issue of liability.

---

1. "Medically necessary" under the Plan is defined as "any service or supply *required* for the diagnosis or treatment of an active illness or injury that is rendered by medical professionals in the United States and is non-experimental." (*See* 1998 Health Benefits Plan, Pl. Exh. 3, at TPA 595) (emphasis added). It appears that certain issues regarding Saks' infertility and her need for chemical and/or surgical intervention to become pregnant would be disputed if this case were going to trial. In that event, it would be necessary for

the jury, as trier of fact, to determine whether Saks had a physical impairment that substantially limited her ability to reproduce. However, defendants have elected not to dispute this point for purposes of this motion. (*See* Exhibit A to Defendants' memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Section III (*Immaterial Facts Which May Be Considered Uncontested for Purposes of Summary Judgment Only but Which Franklin Covey Will Contest At Trial,* Items 4, 6 and 10.))

For the reasons stated below, I am dismissing plaintiff's claim that Franklin Covey's refusal to cover surgical procedures that create pregnancy violates the law.

## Standards for Summary Judgment

The usual standards for an award of summary judgment apply: a party is entitled to judgment if there is no dispute of material fact and that party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). I view the facts most favorably to plaintiff for purposes of considering defendants' motion, which I elect to consider first since, if granted, it would dispose of the entire case.

## Statement of Facts

The following facts are undisputed for purposes of this motion.[2] Plaintiff was employed by defendant Franklin Covey Co. as a store manager at the company's retail store from March 1995 until she resigned in October 1999. As part of its benefits package, Franklin Covey offers a self-insured health benefits plan ("the Plan") that provides coverage to all full-time employees and their dependents. The company has a contractual arrangement with The TPA, Inc. ("The TPA"), an administrator for self-insured health benefit plans, to act as the third-party processing agent for claims made under the Company's Plan.

The Plan provides coverage for all "medically necessary" treatments, which are defined under the Plan as "any service or supply required for the diagnosis or treatment of an active illness or injury that is rendered by or under the supervision of the attending physician, generally accepted by medical professionals in the United States and non-experimental."

An "illness" is defined as "any bodily sickness, disease, mental/nervous disorder or pregnancy." Jane Clark, a Claim Support Manager for the TPA, testified that infertility is a "disease" or "illness" within the meaning of the Plan. Ms. Clark also testified that fertility drugs and assisted reproductive techniques such as intrauterine insemination ("IUI") and in vitro fertilization ("IVF") are not considered experimental treatments for the disease of infertility. However, the Plan excludes coverage for "surgical impregnation procedures," including IVF and IUI. "[C]omplications arising from any non-covered surgery" are also excluded from coverage.

Plaintiff has unsuccessfully attempted to conceive since May 1994. In July 1995, she consulted with Dr. Ralph Berardi, an OB/GYN, who suspected that plaintiff suffered from polycystic ovarian syndrome. Plaintiff underwent a test that ruled out that possibility, and Dr. Berardi recommended that plaintiff and her husband, Joel Saks, continue to attempt a pregnancy through sexual relations. In February 1996, Plaintiff began seeing another OB/GYN, Dr. Deborah Cerar, who recommended that plaintiff undergo several diagnostic tests to determine the cause of her infertility. None of these tests revealed the source of plaintiff's infertility. Upon Dr. Cerar's recommendation, plaintiff began using ovulation kits to determine when she was ovulating so that intercourse with her husband could be timed to maximize the likelihood of conception. This approach, however, proved unsuccessful.

In November 1996, Plaintiff consulted with Dr. John Stangel, a specialist in the area of reproductive endocrinology. Dr. Stangel prescribed for plaintiff the drug Clomid in order to induce and regulate ovulation, and recommended that this treatment be accompanied by intrauterine inseminations ("IUI") and regular intercourse to increase the chances for a successful conception. Because patients who take Clomid must be monitored for potential side effects, plaintiff underwent ultra-

---

**2.** Defendants reserved the right to contest certain facts at trial if the case were not decided on motion.

sounds and blood tests while on that medication. Plaintiff also continued to use ovulation kits in conjunction with her other treatments. She completed two IUI's with Dr. Stangel, neither of which resulted in pregnancy.

By May or June 1997, plaintiff had become dissatisfied with Dr. Stangel's insemination procedures, and decided to switch to a new reproductive endocrinologist, Dr. Gad Lavy. In or about May or June 1997, plaintiff called defendants' third-party administrator ("TPA") to determine the benefits to which plaintiff was entitled under the Plan for her initial visit with Dr. Lavy. The TPA informed plaintiff that, except for the $15 co-payment required for all doctor visits, the initial consultation would be covered under the Plan.

Plaintiff consulted with Dr. Lavy in or about July or August 1997. Lavy diagnosed plaintiff as having a hormonal imbalance and, consequently, ovulation disorder. Dr. Lavy recommended (1) treatment with Clomid, estrogen and progesterone to regulate plaintiff's ovulation, and (2) continued IUI and regular intercourse to increase the likelihood of successful conception. Plaintiff underwent the first cycle of IUI in August 1997. The administration of Clomid to plaintiff of Clomid had to be monitored with blood work and ultrasound tests, as did her course of estrogen and progesterone treatment.

Plaintiff submitted claims to the TPA for all the expenses incurred in connection with Dr. Lavy's treatment. However, the TPA authorized reimbursement only for venipuncture that Lavy had performed on plaintiff, as well for the cost of the drugs estradiol and progesterone administered on August 29, 1997. Payment for the remainder of Lavy's treatment was denied.

On September 8, 1997, plaintiff learned that she was pregnant. During the following two weeks, her pregnancy was closely monitored with ultrasound and blood tests, which defendants refused to cover. Her first ultrasound revealed a heartbeat, as well as a possible second gestational sac. Her second ultrasound, however, on or about September 27, revealed no heartbeat in the first gestational sac, and a follow-up blood test showed a decrease in HCG, the pregnancy hormone. A subsequent test on October 6 confirmed that plaintiff had miscarried, and she underwent a dilation and curettage ("D & C") the next day to remove the miscarried fetus. Further tests on the fetus to determine the cause of the miscarriage were inconclusive.

The TPA refused to reimburse plaintiff for the cost of the D & C, hysterosalpingogram, and the pathology tests performed after plaintiff's miscarriage. Plaintiff successfully appealed that denial, however, and in October 1998, the TPA provided coverage for her pregnancy-related expenses.

Plaintiff continued her treatments with Dr. Lavy through December 1998, or thereabouts, during which time she underwent ten more IUIs. From November 1997 until April 1998, she continued the course of Clomid, progesterone and estrogen accompanied by IUIs. Beginning in May 1998, Dr. Lavy prescribed Humagon, an injectable drug (plaintiff does not recall whether the Humagon was administered in place of, or in conjunction with, the Clomid). Plaintiff continued the course of progesterone, estrogen and IUIs and the monitoring with ultrasounds and blood work that her treatment entailed. Dr. Lavy also advised plaintiff to undergo another hysterosalpingogram, the results of which came back negative. Dr. Lavy then told plaintiff that the next appropriate treatment step was in vitro fertilization ("IVF"). Plaintiff claims that she was unable to pursue that course of action because of defendants' refusal to cover the cost of her treatment with Dr. Lavy. The TPA refused coverage for all of the IUIs and related drug and monitoring expenses that plaintiff incurred while in Dr. Lavy's care. Consequently, plaintiff and her hus-

band were forced to pay for this treatment personally.

In December 1998, Dr. Lavy informed plaintiff that he would not continue to provide her with further treatment until she paid in full the outstanding balance of Lavy's fee, which totaled approximately $6,000. Plaintiff was unable to pay this amount, and ended her relationship with Lavy.

Plaintiff found another reproductive endocrinologist, Dr. Zev Rosenwaks, at the Center for Reproductive Medicine and Infertility in Manhattan. Rosenwaks determined that plaintiff was a good candidate for IVF, and in or about March and early April 1999, prescribed a course of Lupron, Humagon, HCG and Follostim to stimulate superovulation. This treatment, too, required that plaintiff be monitored through blood and ultrasound tests. Plaintiff began the IVF procedure on April 16, 1999, including progesterone therapy to support a potential pregnancy. On April 30, a blood test reflected HCG levels indicating a positive pregnancy, but by the following day, the levels had dropped. Plaintiff was informed that she had a chemical pregnancy, but that it was not sustained.

In July 1999, plaintiff began a second cycle of IVF, including the same course of drugs that she had taken in March and April. Three embryos were implanted on August 7, 1999, and plaintiff again began progesterone therapy. On August 25, 1999, plaintiff's HGC levels indicated another pregnancy, though they were lower than the normally expected level. Testing over the following few days revealed low estrogen levels, and plaintiff experienced some blood spotting. In late August, plaintiff miscarried again. She was told that her pregnancy had been ectopic.

The TPA denied coverage for nearly all of plaintiff's treatment under Dr. Rosenwaks' care, including her consultation and other office visits, diagnostic tests, the injectable drugs, the IVFs, and blood work and ultrasound monitoring costs. It is not disputed that Plaintiff complied with the Plan's procedural requirements for submission of claims.

On an unidentified date, plaintiff filed a charge with the EEOC against Franklin Covey alleging the same ADA, Title VII and Pregnancy Discrimination Act violations as in the instant action. In a determination dated April 27, 1999, the New York District Director found reasonable cause that Franklin Covey had violated those statutes by denying coverage to plaintiff in connection with her infertility treatments.

Plaintiff filed this suit on September 9, 1999. On March 21, 2000, defendants moved for summary judgment as to all of plaintiff's claims. On that same date, plaintiff cross-moved for partial summary judgment as to her ADA, PDA, Title VII and breach of contract claims. For the reasons that follow, defendant's motion is granted, and the case is dismissed.

## Conclusions of Law

1. *Franklin Covey's Exclusion of Surgical Impregnation Procedures Does Not Violate the Americans with Disabilities Act*

Congress passed the Americans with Disabilities Act in order to, *inter alia,* "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1),(2). To those ends, the statute prohibits discrimination by any "covered entity" against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms conditions, and privileges of employment." 42 U.S.C. § 12112(a). The "terms and conditions" of employment, within the meaning of the Act, include the provision of fringe benefits. *See Castella-*

*no v. City of New York,* 142 F.3d 58, 66 (2d Cir.), *cert. denied,* 525 U.S. 820, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998).

Before I can reach the merits of plaintiff's claim, I must dispose of a challenge to her ability to maintain this action. The parties do not dispute that Rochelle Saks is infertile, or that infertility is a physical impairment. Defendant does, however, contend that plaintiff is not a "person with a disability," and thus lacks standing to sue under the ADA, because her impairment does not substantially limit her in any major life activity.

■ This is an unsupportable contention. Plaintiff is substantially limited in her ability to reproduce—i.e., to conceive and bear children. In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the United States Supreme Court declared "reproduction" to be a major life activity. *See Bragdon,* 524 U.S. at 638, 118 S.Ct. 2196. Defendant has not articulated any principled basis upon which this Court could refuse to apply that rather clear-cut rule to the facts at bar.

Defendants recognize that *Bragdon* is on the books and binding on this Court. So they urge that, when ruling that "reproduction" constituted a major life activity, the Supreme Court actually meant to say that the plaintiff in *Bragdon* was limited in her ability to engage in "sexual activity."

Defendants make this argument on a rather strained reading of *Bragdon.* In that case, the plaintiff suffered from AIDS. She alleged that she was a "person with a disability" because she was substantially limited in her ability to reproduce—that is, to conceive and bear a child. In *Bragdon,* there was no indication that the plaintiff was physically unable to have sexual intercourse. Nor was there any suggestion

that she *could not* conceive if she had "unprotected" sexual intercourse. Instead, plaintiff argued that she was reproductively limited because she could not conceive while having "safe sex"—i.e., while using a condom. Thus, any limitation on reproduction, while a by-product of her AIDS, was the result of a conscious, voluntary—and, I hasten to add, socially responsible—choice on the part of the plaintiff. Nonetheless, the Supreme Court ruled that she was substantially limited in the major life activity of reproduction by virtue of her disease.

Viewing *Bragdon* in this (the only fair) light, the fallacy in defendants' argument is immediately apparent. On the record before me, it appears that plaintiff Saks *cannot* become pregnant without some sort of chemical or surgical assistance. That is, her condition (infertility) physically impairs her in such a way that her reproductive organs do not work like those of a fertile woman of her age. There can be no question that Saks' infertility "substantially limits" her ability to reproduce—indeed, it appears to prevent it altogether, absent outside intervention of a very drastic nature.[3] Thus, she is a "person with a disability" within the meaning of the ADA.[4]

Defendants' contention that *Bragdon* does not answer "the central question in this case"—which it identifies as "whether infertility is a limitation on the *activity* of reproduction"—is simply silly. Notwithstanding *Bragdon,* Defendants assert that an individual cannot be reproductively limited unless she is unable to engage in sexual activity. (*See* Def. Br. at 8–9.) Indeed, defendants fairly imply that "reproduction" is not an activity in and of itself, and that the only "activity" connected with reproduction is sex. That is a ridiculous

---

**3.** For a discussion of whether the availability of intervention brings the plaintiff within the scope of recent Supreme Court decisions limiting the availability of ADA relief to persons with so-called "correctable" conditions, see *infra,* at 325–26.

**4.** *See* footnote 1, *supra,* concerning the scope of defendants' factual concessions on this question.

argument. As anyone who has given birth can attest, sex is the least of it.

Defendants then urge, albeit in a footnote, that infertility cannot be a disability because it is correctable, citing Judge Pauley's decision in *United States v. Lauersen,* No. 98 Cr. 1134, 1999 WL 637237 (S.D.N.Y. Aug.20, 1999). (*See* Def. Br. at 9 n. 5.) However, Judge Pauley did not hold that infertility is not a disability. Indeed, Judge Pauley expressly declined to rule on questions analogous to the one raised by plaintiff in this civil lawsuit—namely, whether either the ADA or Title VII required health insurance companies to cover fertility treatments. *See id.,* at *3. Rather, he ruled that a criminal defendant (an obstetrician/gynecologist accused of submitting fraudulent claims for insurance reimbursement for non-covered fertility treatments) could not assert a claim-of-right defense to the criminal charges he was facing, because Second Circuit precedents on the question of fraudulent intent in criminal cases foreclosed any such ruling. Judge Pauley did opine, in *dicta,* that cases in which various Circuit Courts of Appeal had rejected the premise that Title III of the ADA applied to the contents of health insurance plans—a position that the Second Circuit subsequently declined to adopt as a wholesale proposition, *see Pallozzi v. Allstate Life Ins. Co.,* 198 F.3d 28 (2d Cir.1999)—were "consonant" with recent Supreme Court cases that tempered the scope of the ADA in circumstances where the effects of a disabling condition could be overcome. *See, e.g., Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484, (1999). That hardly qualifies as precedent for the ruling defendants seek from me.

Defendants urge that *Murphy* and *Sutton* compel a finding that infertility is not a disability, precisely because it can be overcome in certain people by various treatments, including some that are covered under its insurance plan. The short answer to this argument is that there is a critical distinction between *Murphy* and *Sutton,* on the one hand, and plaintiff Saks: the treatment prescribed for Murphy (who suffered from high blood pressure that could be alleviated by medication) and the plaintiffs in *Sutton* (who had myopic vision that could be corrected by wearing glasses) worked, whereas Ms. Saks' infertility has yet to be either cured or "bypassed." Defendants note that Saks has managed to become pregnant three times while receiving various fertility treatments. However, she has miscarried each time. She has never achieved a successful pregnancy—one that resulted in the birth of a child. Therefore, her condition has not been successfully overcome, as were the conditions of the plaintiffs in *Murphy* and *Sutton.*

Nonetheless, defendants raise an interesting and difficult point. The full scope of *Murphy* and *Sutton* has yet to be fleshed out, of course, but in the opinion of this Court, the Supreme Court did not intend to rule that no disease or organic defect can qualify as an ADA disability as long as some treatment can ameliorate its impact in some percentage of persons afflicted, however small that percentage may be. Indeed, I think it highly likely that courts will, over time, develop a spectrum of "disability" along which various diseases will fall, depending on some case-by-case analysis of their seriousness, their susceptibility to treatment, the rate at which treatment succeeds in curing them altogether or lessening their impact, and the impact of available treatments on the plaintiff at bar. For example, I find it inconceivable that persons who suffer from chronic conditions involving organ failure, like Type I diabetes or kidney failure, are not "substantially limited" in certain major life activities, simply because they can lead relatively normal lives by taking multiple injections of insulin everyday or by hooking themselves up to dialysis machines (I use the phrase "relatively normal" advisedly). And I view it as highly unlikely that

courts will decide that "cancer" as a class of diseases does not substantially limit certain major life activities, just because *some* cancers in *some* people (though not *all* cancers in *all* people) can be successfully treated.

Infertility is the chronic failure of an organ system. It can be treated, but the success rate (with success defined as becoming pregnant and carrying to term) is far from compelling—closer to that of certain cancers than to the all-but-universally correctable conditions discussed in *Murphy* and *Sutton.* Indeed, treatment has not succeeded in this very case. Whether the availability of draconian regimens that avoid the consequences of infertility in a small percentage of individuals places this particular impairment closer to the *Murphy/Sutton* end of the spectrum or the diabetes/cancer/kidney failure end could not possibly be determined on the present record. But the position espoused by defendants is not so self-evident (as demonstrated by the fact that they relegate this argument to a footnote) that I would dismiss on *Murphy/Sutton* grounds at this juncture.

Finally, Defendants argue that infertility *cannot* be a disability, because people become infertile for many reasons, including reasons that have nothing whatever to do with a disease or defect—age being the obvious one. For this unremarkable proposition, defendants cite *McGraw v. Sears Roebuck & Co.,* 21 F.Supp.2d 1017 (D.Minn.1998), in which Judge Rosenbaum concluded that menopause was not a disability—a proposition that enlightened women have been espousing for centuries.

■ This Court harbors no doubt that infertility that results from the natural aging process, rather than from some dis-

ease or defect, is not a "disability" within the meaning of the ADA—just as age-induced inability to focus optically, which crops up in all of us at about the age of 50, is not a "disability," even though it limits (in some cases substantially) an older person's ability to see.[5] The American College of Obstetricians and Gynecologists defines "infertility" as the *abnormal* functioning of the reproductive system. *See* American College of Obstetricians and Gynecologists, *Infertility: Causes and Treatment* 1 (1992). A post-menopausal woman cannot conceive, but she is not "disabled" because her reproductive system—or, rather, her non-reproductive system—is in fact functioning normally. When passing the ADA, Congress was not trying to undo the inevitable effects of aging, like some legislative King Canute commanding in vain that the tide not come in. But this does not mean that a pre-menopausal women in her child-bearing years is not "disabled" if she is unable to become pregnant when, absent some physical abnormality, she would ordinarily be able to do so.[6]

Thus, plaintiff has standing to pursue an ADA claim. That said, however, plaintiff's claim under the ADA must be dismissed, for two reasons.

■ First, it is undisputed that Franklin Covey's plan offers the same insurance coverage to all its employees. It does not offer infertile people less pregnancy and fertility-related coverage than it offers to fertile people. Therefore, as a matter of law, the Plan does not violate the ADA. In *EEOC v. Staten Island Savings Bank,* 207 F.3d 144 (2d Cir.2000), the Court of Appeals, joining the Third, Seventh and Eighth Circuits, held that insurance distinctions that apply equally to all insured employees do not discriminate on

---

5. *See* Abigail Zuger, *Reading Glasses, as Inevitable as Death and Taxes. Or Are They?,* N.Y. Times, Aug. 8, 2000, at F7.

6. Defendants raise the fascinating question of whether a woman who becomes infertile because of premature menopause—that is, the abnormally early onset of an otherwise normal bodily process—should be considered disabled. Fortunately, that question need not be resolved on this motion, because nothing in the record before me suggests that Rochelle Saks is such a woman.

the basis of disability. In that case (brought by the EEOC on behalf of the defendant bank's employees, pursuant to the Commission's Interim Guidance on the Applicability of the ADA to Health Insurance that forms the linchpin of plaintiff's argument here), the employer's policy significantly limited coverage for mental health care while providing much greater coverage for physical illnesses. The Commission argued that defendant's failure to offer employees equivalent benefits for mental and physical illness discriminated on the basis of disability. The Court disagreed, stating:

> We... agree with our sister circuits that "so long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities."

*Staten Island Savings Bank,* 207 F.3d at 150 (quoting *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 608 (3d Cir.1998)). The Court went on to observe:

> It is fully consistent with an understanding that the ADA protects the individual from discrimination based on his or her disability to read the Act to require no more than that access to an employer's fringe benefit program not be denied or limited on the basis of his or her particular disability.

*Id.* at 151. The panel also noted that requiring equivalent coverage for every type of disability "would destabilize the insurance industry in a manner definitely not intended by Congress." *Id.* at 152 (quoting *Ford,* 145 F.3d at 608). Finally, the Court expressly declined to defer to the Commission's Interim Guidance on this question. *See id.*

Plaintiff suggests that *Staten Island Savings Bank* does not compel dismissal of her claim because there the challenge was to non-equivalent levels of coverage for two gross categories of impairment, physi-

cal and mental, while here the issue is failure to provide coverage for certain types of procedures that overcome infertility. With respect, I fail to see any difference. Insurance policies have historically contained exclusions for particular types of procedures. Indeed, surgical impregnation procedures are not the only treatments expressly excluded from coverage under Franklin Covey's Plan. The policy also excludes artificial heart implantation, penile prosthetic implants, Kerato-refractive eye surgery and non-human organ transplants. It is beyond dispute that, under this Plan, people with cancer have access to a greater range of treatment for their problem than do people with infertility. But all employees face exactly the same limitation. That the limitation hits infertile employees like Ms. Saks harder than it hits other employees is of course true, but the limitation on mental health coverage in *Staten Island Savings Bank* was more disruptive to bank employees whose family members needed therapy than to those who did not. Nonetheless, the Circuit held that there was no ADA discrimination.[7]

■ Second, and even more fundamental, Franklin Covey's Plan is not covered by the ADA. It is undisputed that Franklin Covey's Plan is a bona fide benefit plan under the Employment Retirement Insurance Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 *et seq.* It is also a self-insured plan. Thus, it falls within the so-called "safe harbor" provision found at § 501(c)(3) of the ADA, 42 U.S.C. § 12201(c)(3), which provides that nothing in the ADA shall be construed to prohibit or restrict an employer from "establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance." *See also* 29 C.F.R. § 1630.16(f). The only self-insured plans that fall outside the ADA Safe Harbor are

---

7. To the extent that Saks argues that men receive superior coverage for infertility than

do women, her claim falls under different statutes. *See* Points 2 and 3, *infra.*

those that are used as a subterfuge to evade the purposes of the statute. However, the Second Circuit recently held, in *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 104 (2d Cir.1999), that a benefit exclusion adopted by a self-insured Plan prior to the passage of the ADA by definition cannot have been adopted as a subterfuge to avoid the statute. Franklin Covey's insurance plans have excluded surgical impregnation procedures since 1989, if not earlier. The ADA became law in 1991. That ends the discussion.

For the above reasons, plaintiff's claim for relief under the ADA is dismissed.

### 2. Plaintiff's Title VII Claims Are Similarly Deficient and Are Dismissed

■ The Court can give plaintiff's title VII claims relatively short shrift. Analogizing from *Staten Island Savings Bank*, as long as both men and women receive the same benefits and are subject to the same exclusions under an employer's insurance policy, the policy does not discriminate on the basis of sex. Under Franklin Covey's Plan, both men and women are covered for certain types of infertility treatments (examples), and neither men nor women may receive benefits for other types of infertility treatment (surgical impregnation). It is no answer to say that the excluded treatments can only be performed on women, because male employees can claim infertility-related benefits for treatments performed on their wives—and are, conversely, precluded from obtaining benefits for surgical impregnation of their wives. Thus, both males and females receive the same "compensation, terms, conditions [and] privileges of employment" under the Covey Plan, as required under 42 U.S.C. § 2000e–2(a)(1). All Franklin Covey employees, male and female, who see surgical impregnation as the answer to their infertility problems have to foot the bill.

If female employees of Franklin Covey, like Saks, were denied benefits for surgical impregnation, but those benefits were made available to male employees whose wives were surgically impregnated, Title VII would come into play. It does not on the facts before me. Plaintiff's claim of discrimination based on sex in dismissed.

### 3. Plaintiff's Claim Under the Pregnancy Discrimination Act Must Also Be Dismissed

Plaintiff next contends that the exclusion of surgical impregnation procedures from Franklin Covey's policy constitutes discrimination on the basis of pregnancy within the meaning of the Pregnancy Discrimination Act (which is an amendment to Title VII). Defendants make two responses: one meritorious, one not.

■ First, defendants contend that the PDA does not apply because infertility is not a "pregnancy-related condition," and cannot be so, since infertility (which is by definition not pregnancy) falls outside the ambit of the statute. Once again, it appears that the United States Supreme Court has held exactly the opposite.

In *Int'l Union, UAW v. Johnson Controls*, 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), the Supreme Court was asked to determined the legality of Johnson Controls' policy of prohibiting women of childbearing age from working in positions where they could be exposed to chemicals that were potentially damaging to ova and/or fetuses. The Court ruled that any employment policy that discriminated on the basis of "childbearing capacity" violated Title VII under the PDA because it "explicitly classifies on the basis of *potential for pregnancy*" (emphasis added). The members of the plaintiff union in *Johnson Controls* were not interested in becoming pregnant, as Rochelle Saks is; they were interested in working in the best (i.e., most lucrative) jobs without regard to their reproductive status. If discrimination under the PDA were limited to conditions related to an actual pregnancy, *Johnson Controls* would not be on the

books. Because it is on the books, conditions that are not associated with an actual pregnancy may be "pregnancy-related conditions" within the meaning of the statute.

I am constrained to note that, while neither Saks' predicament nor that of the plaintiffs in *Johnson Controls* falls within the limited definition of "pregnancy-related" that defendants urge me to adopt, Saks comes far closer to having a "pregnancy-related condition" as a lay person would understand that phrase, than do the assembly-line workers in *Johnson Controls*. If the latter had standing to sue under the PDA, then Saks must also. *See Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393, 1403 (N.D.Ill.1994) ("If potential pregnancy is treated like pregnancy for purposes of the PDA, it follows that potential-pregnancy-related medical conditions should be treated like pregnancy-related medical conditions for purposes of the PDA"); *Erickson v. Bd. of Governors of State Colleges and Universities for Northeastern Ill. Univ.*, 911 F.Supp. 316 (N.D.Ill.1995) (same); *Zatarain v. WDSU–Television, Inc.*, No. Civ. 94–1018, 1995 WL 107090, at *1 (E.D.La. March 9, 1995) ("The PDA requires Courts to consider whether an employer treats pregnancy or pregnancy-related conditions, such as infertility, differently than other medical conditions."). To the extent the Eighth Circuit ruled otherwise in *Krauel v. Iowa Methodist Medical Center*, 95 F.3d 674 (8th Cir.1996), I am unpersuaded in view of *Johnson Controls*.

■ However, Saks nonetheless fails to state a claim under the PDA for the same reason it fails to state a claim under Title VII or the ADA. Nothing in that statute requires an employer to provide insurance coverage for every type of infertility treatment. The PDA merely compels employers to give all their employees—pregnant, potentially pregnant, and not pregnant—

the same insurance coverage. Franklin Covey offers what it describes as "full coverage" during pregnancy, regardless of how the pregnancy was achieved (although Saks' difficulty in obtaining reimbursement for expenses associated with her chemically and surgically assisted pregnancies gives one pause in that regard). And it offers all its employees reimbursement for some, but not all, treatments to overcome infertility. It discriminates against the infertile only in the same sense that it discriminates against those who might need penile prosthetic implants (which may be medically necessary to cure impotence), Kerato-refractive eye surgery (which may be medically necessary to cure vision defects), hearings aids (which may be medically necessary to overcome deafness), or those who suffer from eating or sleep disorders: they must pay for those procedures or devices themselves.[8]

Thus, plaintiff's PDA/Title VII claim—her last remaining Federal claim—must be dismissed as well.

4. *Plaintiff's State Law Claims for Breach of Contract and Violation of the New York State Human Rights Law are Preempted by ERISA*

■ With her federal claims disposed of, I am left with state law claims for breach of contract (for refusing to compensate Saks for "medically necessary" treatment as that term is defined in the Plan) and violation of New York's Human Rights Law, Exec. L. § 296. As these claims are preempted by ERISA, they must be dismissed.

ERISA is a comprehensive statute, designed by Congress to regulate all aspects of employee welfare benefit programs. *See Nealy v. U.S. Healthcare HMO*, 844 F.Supp. 966, 970 (S.D.N.Y.1994). It therefore preempts all state laws that "relate to" self-insured employee benefit plans,

---

**8.** It bears noting that several of the above-mentioned exclusions from plaintiff's policy (which are, admittedly, few in number) involve more expensive treatments for conditions that can be remedied in some (though not all) individuals with less expensive or invasive treatments (Viagra for impotence, for example, or glasses for impaired vision).

such as Franklin Covey's. *See* 29 U.S.C. § 1144(a). The phrase "relate to" is given the broadest common sense meaning; that is, a state law relates to a benefit plan if it has a connection with or reference to such a plan. *See Nealy*, 844 F.Supp. at 971. ERISA preemption is triggered "when a law has an effect on the administration of the plan, 'such as determining an employee's eligibility for a benefit and the amount of that benefit.'" *Id.* at 972 (quoting *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146–47 (2d Cir.) *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989)). Thus, it has long been held that a plaintiff has no claim for breach of contract against a plan administrator for failing to award benefits, because such claims are squarely preempted by ERISA. *See Devlin v. Transportation Comm. Int'l Union*, 173 F.3d 94, 101 (2d Cir.1999); *Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir.1998). Similarly, claims under the Executive Law, to the extent that law in not coincident with Title VII and the ADA, are preempted. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

■ Plaintiff argues that defendants have waived their right to claim preemption by not pleading it as an affirmative defense, relying on Fed.R.Civ.P. 8(c) and a series of wholly inapposite cases, such as *Allen v. Westpoint–Pepperell, Inc.*, 11 F.Supp.2d 277 (S.D.N.Y.1997) (a case in which the employer affirmatively agreed to waive ERISA preemption) and *Dueringer v. General American Life Insurance Co.*, 842 F.2d 127 (5th Cir.1988) (in which the defendant first raised the preemption issue on appeal). I find no waiver in this case. Federal preemption "is not, by its nature, an affirmative defense to a state law claim." *Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear and Allied Workers' Union*, 511 F.Supp. 1180, 1187 (S.D.N.Y.1981), so defendant's failure to plead preemption specifically cannot be fatal to its assertion at this juncture. Plaintiff's contention that she would be entitled to discovery on the issue of presumption borders on the frivolous. This is not a fact-intensive issue, but a point of law that has been settled (in case of the Executive Law claim, by the United States Supreme Court) for many years.

Moreover, defendants may raise the defense of failure to state a claim in their answer, on motion, or at trial. Fed. R.Civ.P. 12(h)(2). The Advisory Committee has observed that the defense of failure to state a claim is "expressly preserved against waiver" by Rule 12(h)(2). ERISA preemption means that the plaintiff's state law causes of action fail to state claims on which relief may be granted. Thus, she cannot assert waiver to object to their dismissal.

Were it necessary, however, this Court would, in an exercise of its discretion, permit the defendants to amend their answer to assert ERISA preemption. Because the defense raises a pure question of law, it would neither work any prejudice to plaintiff nor delay dismissal of the action.

Because the complaint has been dismissed in its entirety on defendants' motion, plaintiff's cross-motion is moot.

### Conclusion

The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint, with costs on the motion to defendants.

This constitutes the decision and order of the Court.