**Rochelle SAKS, Plaintiff–Appellant,**

v.

**FRANKLIN COVEY CO. and Franklin Covey Client Sales, Inc., Defendants–Appellees.**

**Docket No. 00–9598.**

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 2002.

Decided Jan. 15, 2003.

---

Darnley D. Stewart, Bernstein Litowitz Berger & Grossmann, LLP, (Daniel L. Berger, Leah Guggenheimer, on the brief), New York, NY, for Plaintiff–Appellant.

Steven C. Bednar Manning Curtis Bradshaw & Bednar LLC, Salt Lake City, UT, for Defendants–Appellees.

Jonathan S. Franklin, Hogan & Hartson LLP, Washington, DC (Catherine E. Stetson, on the brief), for Amicus Curiae American Society for Reproductive Medicine, in Support of Plaintiff–Appellant.

Before: WALKER, Chief Judge, F.I. PARKER and SOTOMAYOR, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

This case raises the question of whether unlawful discrimination occurs when a woman is denied coverage for infertility treatments that can only be performed on women. After plaintiff-appellant Rochelle Saks was denied coverage for certain infertility procedures under her employee health benefits plan, she sued her employer, Franklin Covey Client Sales, Inc., and its parent company, Franklin Covey Co. (collectively, "Franklin Covey"), claiming that the denial of coverage constituted a breach of her contractual rights and violated her civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the New York Human Rights Law, N.Y. Exec. Law § 290, *et seq.* The United States District Court for the Southern District of New York (Colleen McMahon, *Dis-*

*trict Judge* ) granted Franklin Covey's motion for summary judgment on the grounds that (1) the lack of coverage for the contested infertility procedures—specifically, artificial insemination, *in vitro* fertilization, and *in utero* insemination—does not violate any of the federal statutes and (2) Saks's state law claims were preempted by ERISA. *See Saks v. Franklin Covey Co.,* 117 F.Supp.2d 318, 327–28, 329, 330 (S.D.N.Y.2000).

With respect to Saks's Title VII and PDA claims, although we differ with the district court's analysis in several important respects, we affirm the grant of summary judgment in favor of Franklin Covey. As to the preemption of Saks's state law claims by ERISA, we remand to the district court for further proceedings.

## BACKGROUND

### I. Relevant Facts

Franklin Covey employed Saks as a store manager from March 1995 until she resigned in October 1999. During her tenure of employment, Saks was a member of Franklin Covey's self-insured health benefits plan ("the Plan"), which provided coverage to full-time employees and their dependents. Claims under the Plan were handled through The TPA, Inc. ("TPA"), a third-party processing agent hired by Franklin Covey.

Under the Plan, an employee is entitled to benefits for "medically necessary" procedures, which are defined as "[a]ny service ... required for the diagnosis or treatment of an active illness or injury that is rendered by or under the direct supervision of the attending physician." Franklin Covey Medical/Dental Plan 78 (1998) ("Franklin Covey Plan"). The Plan defines an active illness as "[a]ny bodily sickness, disease, mental/nervous disorder or pregnancy." *Id.* at 77.

Under the Plan, Franklin Covey employees may claim benefits for a variety of infertility products and procedures, such as ovulation kits, oral fertility drugs, penile prosthetic implants (when certified by a physician to be medically necessary), and nearly all surgical infertility treatments. *See id.* at 46, 49, 52. Examples of covered surgical infertility treatments include procedures to remedy conditions such as variococeles (varicose veins in the testicles causing low sperm count), blockages of the vas deferens, endometriosis, and tubal occlusions. The Plan expressly excludes coverage for "[s]urgical impregnation procedures, including artificial insemination, in-vitro fertilization or embryo and fetal implants" (collectively, "surgical impregnation procedures"), even if medically necessary. *Id.* at 49, 52. However, once pregnancy is achieved, whether by covered or uncovered means, all pregnancy-related costs are covered. *See Saks,* 117 F.Supp.2d at 329.

During her employment with Franklin Covey, Saks attempted unsuccessfully to have a child with her husband. Under the care of several reproductive endocrinologists, Saks followed various courses of action, including (1) the use of ovulation kits, (2) the administration of the drug Clomid in order to induce and regulate ovulation, (3) intrauterine inseminations ("IUIs"), (4) *in vitro* fertilization ("IVFs"), (5) the use of progesterone and estrogen, (6) the administration of several injectable fertility drugs, such as Humagon, and (7) blood tests and ultrasounds in order to monitor the potentially harmful side effects of the drugs prescribed to her. *See id.* at 321–23. Saks achieved pregnancy in September 1997 and again in August 1999, but unfortunately each pregnancy ended in a miscarriage. *See id.* at 322–23. In April 1999, Saks also had a chemical pregnancy (one marked by a hormonal change but not confirmed by an ultrasound) that was not sustained. *See id.* at 323.

Saks sought reimbursement from the TPA for all of the costs associated with her infertility treatments. For·the purposes of the summary judgment motion, Franklin Covey did not dispute that infertility is an illness as defined by the Plan or that surgical impregnation procedures were "medically necessary" to·treat Saks's infertility problems. *See id.* at 320 & n. 1. The TPA refused to reimburse Saks for a great many of the costs, including all of the IUIs, IVFs, injectable fertility drugs, and tests necessary to monitor the potential side effects of the drugs.[1] *See id.* at 322–23. Compensation for the IUIs and IVFs was denied based on the Plan's express exclusion of coverage for surgical impregnation techniques. Although the costs of non-insulin injectable drugs are generally covered under the Plan, the TPA rejected Saks's claims for the injectable fertility drugs and the drug-related monitoring because they were used in conjunction with the surgical impregnation procedures. *See* Franklin Covey Plan 49; Clarke Dep. 140–43, 161, 166–67. After filing a charge against Franklin Covey with the EEOC, Saks initiated the instant action.

## II. District Court Decision

In the district court, Saks alleged that Franklin Covey breached its contractual obligations and that the Plan's exclusion of coverage for surgical impregnation procedures violates the ADA, Title VII, the PDA, and the New York Human Rights Law. Of specific relevance to this appeal, Saks argued that the Plan violates the PDA, which prohibits discrimination on the basis of pregnancy and "related medical conditions," because the Plan's benefits for infertility treatments are inferior to its coverage for non-pregnancy-related illnesses. Saks also argued that the Plan

discriminates on the basis of sex, in violation of Title VII, because it provides incomplete coverage for surgical treatments that address female infertility but provides complete coverage for surgical procedures that remedy male infertility. In moving for summary judgment, Franklin Covey argued that the Plan does not discriminate against infertility or women, and that, in any event, the PDA does not prohibit discrimination based on infertility. In addition, Franklin Covey moved to dismiss Saks's state law claims on the basis that they are preempted by ERISA.

In granting summary judgment for Franklin Covey, the district court determined that the Plan's exclusions affect male and female employees equally and thus did not violate Title VII. *See Saks,* 117 F.Supp.2d at 328. Addressing the PDA claim, the district court first concluded that the PDA prohibits discrimination on the basis of infertility because infertility is a "pregnancy-related" condition. *See id.* at 328–29. The district court nevertheless found that the Plan does not violate the PDA because it provides equal coverage for male and female employees who suffer from infertility. The district court dismissed Saks's state law claims as preempted by ERISA and rejected Saks's argument that defendants had waived the preemption defense by failing to raise it in their answer. *See id.* at 329–30. Finally, the district court dismissed Saks's claims based on disability discrimination. *See id.* at 326–28. Saks has appealed from all of these rulings except the last one.

## DISCUSSION

█ We review the district court's grant of summary judgment *de novo. See Lombard v. Booz–Allen & Hamilton, Inc.,* 280

---

1. The TPA also initially denied her coverage for expenses related to her September pregnancy and subsequent miscarriage. In October 1998, Saks successfully appealed this denial and was reimbursed for her expenses. *See Saks,* 117 F.Supp.2d at 322.

F.3d 209, 214 (2d Cir.2002). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

I. Title VII and the Pregnancy Discrimination Act

A. Background

■ Title VII prohibits employment practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This prohibition extends to discrimination in providing health insurance and other fringe benefits. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983).

■ The Pregnancy Discrimination Act amends Title VII's definition of discrimination "because of sex" to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The PDA further mandates that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.* Under the PDA, "an otherwise inclusive plan that single[s] out pregnancy-related benefits for exclusion" is discriminatory on its face. *Newport News,* 462 U.S. at 684, 103 S.Ct. 2622.

In challenging the district court's analysis of her PDA and Title VII claims, Saks argues that (1) the district court applied incorrect standards in evaluating her claims and (2) the Plan discriminates on the basis of sex under Title VII because it provides fewer benefits for infertile female employees than it does for infertile male employees. We agree that the district court applied incorrect standards in analyzing both the PDA claim and the Title VII sex-discrimination claim. Nevertheless, for the reasons explained below, we find that the Plan's exclusion of surgical impregnation procedures does not fall within the purview of the PDA and, because it is gender neutral, does not violate Title VII.

B. Standards for PDA and Title VII claims

1. Equal access standard

In analyzing whether the Plan violates Title VII, the district court adopted the equal access standard used by this court in construing the scope of the ADA's prohibition of discrimination based on disability. *See Saks,* 117 F.Supp.2d at 328–29. In *EEOC v. Staten Island Savings Bank,* we held that an employee disabilities benefits plan that provided more benefits for physical disabilities than for mental disorders did not violate the ADA, so long as mentally disabled employees had equal access to the physical disability benefits provided to their coworkers. *See* 207 F.3d 144, 149–50 (2d Cir.2000). Extending this analysis to the Title VII context, the district court found that "as long as both men and women receive the same benefits and are subject to the same exclusions under an employer's insurance policy, the policy does not discriminate on the basis of sex." *Saks,* 117 F.Supp.2d at 328.

The district court erred in applying the equal access standard to Saks's Title VII claim. In *General Electric v. Gilbert,* the Supreme Court applied the equal access standard to an employee disability benefits plan that provided compensation during

periods of all disabilities except pregnancy. The Court found that the plan did not violate Title VII because men and women had equal access to the same benefits, even if certain sex-specific benefits were excluded. The Court reasoned that "pregnancy-related disabilities constitute an *additional risk,* unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially even-handed *inclusion* of risks." 429 U.S. 125, 139, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (emphasis added). Shortly after the *Gilbert* decision, Congress enacted the PDA, and, in so doing, "not only overturned the specific holding in *General Electric v. Gilbert,* ... but also rejected the test of discrimination employed by the Court in that case." *Newport News,* 462 U.S. at 676, 103 S.Ct. 2622; *accord id.* at 678, 103 S.Ct. 2622 (the PDA "unambiguously expressed [Congress's] disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision"); *see also Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 277 & n. 6, 284, 288, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 483 (2d Cir.1985), *aff'd modified and remanded on other grounds,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986).

■ In light of Congress's repudiation of the equal access standard as applied in *Gilbert,* we conclude that this test is inapplicable to Title VII claims involving sex discrimination in the provision of employee benefits packages. Under Title VII the proper inquiry in reviewing a sex discrimination challenge to a health benefits plan is whether sex-specific conditions exist, and if so, whether exclusion of benefits for those conditions results in a plan that provides inferior coverage to one sex. *See Newport News,* 462 U.S. at 676, 103 S.Ct. 2622 (stating that equality in employment health benefits plans is measured by the relative comprehensiveness of coverage for men and women).

### a. Couple Analysis

■ Saks further contends that the district court improperly endorsed a "couple analysis," defined by the parties as a finding that a female-specific exclusion does not constitute sex discrimination so long as male and female employees and their respective partners receive the same health benefits when considered as a couple. Franklin Covey, on the other hand, maintains that the couple analysis is used regularly by courts in determining whether an employer's benefits plan constitutes sex discrimination under Title VII. We reject Saks's contention that the district court relied on the couple analysis, and find that Judge McMahon properly focused on the effect of the exclusion on employees, male and female, not on the benefits offered to the couple (*i.e.,* the employee and his or her spouse, considered together). *See Saks,* 117 F.Supp.2d at 328. Contrary to Franklin Covey's suggestion, moreover, we find that the Supreme Court's decision in *Newport News* gives us no reason to adopt the couple analysis, as defined above, as part of this Circuit's PDA or Title VII jurisprudence.

In *Newport News,* the Supreme Court held that an employee health benefits plan violated Title VII by covering pregnancy-related costs for employees but excluding such costs for the spouses of employees. Reasoning that this exclusion would necessarily affect only the coverage offered to the female spouses of male employees, the Court found that the exclusion discriminated against male employees. *See* 462 U.S. at 684–85, 103 S.Ct. 2622. The Court, therefore, focused on whether male and female employees received equal coverage under their health benefits packages. It did not hold, as Franklin Covey seems to suggest, that an across-the-board female-

specific exclusion would pass muster under Title VII or the PDA, so long as all couples received the same benefits. Under Franklin Covey's couple analysis, exclusions based on pregnancy would not violate Title VII, a conclusion that has been squarely rejected by Congress and the Supreme Court. *See* 42 U.S.C. § 2000e(k); *Newport News*, 462 U.S. at 684, 103 S.Ct. 2622.[2]

### C. Saks's Infertility Discrimination Claim

■ Saks claims that the Plan violates the PDA because it provides fewer benefits for infertility procedures than for treatment of other types of illnesses. The central issue with respect to this claim is a threshold one of coverage: Whether the PDA's prohibition of discrimination on the basis of pregnancy and "related medical conditions" extends to discrimination on the basis of infertility. We have no doubt that by including the phrase "related medical conditions," the statutory language clearly embraces more than pregnancy itself. *See Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 647–48 (8th Cir.1987). The question is how much more.

■ Every exercise in statutory construction must begin with the words of the text. *See Mallard v. United States Dist. Court*, 490 U.S. 296, 300–01, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir.2002). The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). We have stated that "the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn Hous. Auth.*, 277 F.3d at 144; *accord United States v. Interlink Sys., Inc.*, 984 F.2d 79, 82 (2d Cir.1993).

Title VII is, at its core, a statute that prohibits discrimination "because of," *inter alia*, an individual's sex. The PDA modified Title VII by requiring that discrimination on the basis of "pregnancy, childbirth, or related medical conditions" be considered discrimination "because of sex." 42 U.S.C. § 2000e(k). Because reproductive capacity is common to both men and women, we do not read the PDA as introducing a completely new classification of prohibited discrimination based solely on reproductive capacity. Rather, the PDA requires that pregnancy, and related conditions, be properly recognized as sex-based characteristics of women.

■ This understanding of the PDA comports with the Supreme Court's reasoning in *International Union v. Johnson Controls, Inc.*, in which the Court indicated that, although discrimination based on

---

**2.** Although one might characterize the Court's analysis in *Newport News* as a type of "couple analysis," it differs from the couple analysis described by the parties. The Court evaluated the parity of benefits offered to male and female employees, which in that case included an assessment of the benefits offered to the employees' spouses. *See Newport News*, 462 U.S. at 683–84, 103 S.Ct. 2622. Likewise, in the instant case, we engage in a couple analysis to the extent that we evaluate whether the exclusion of surgical impregnation procedures results in less comprehensive benefits package for female employees. For the reasons stated *infra*, we conclude that it does not.

"childbearing capacity" violates Title VII as modified by the PDA, discrimination based on "fertility alone" would not. *See* 499 U.S. 187, 198, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). We conclude that under this reasoning, for a condition to fall within the PDA's inclusion of "pregnancy ... and related medical conditions" as sex-based characteristics, that condition must be unique to women.[3]

Infertility is a medical condition that afflicts men and women with equal frequency. *See* Joint App. Ex. 10 at FC 6 (stating that approximately one third of infertility problems are due to male factors, one third due to female factors, and one third due to couple factors); *see also* Cintra D. Bentley, *A Pregnant Pause: Are Women Who Undergo Fertility Treatment to Achieve Pregnancy Within the Scope of Title VII's Pregnancy Discrimination Act?*, 73 Chi.-Kent L.Rev. 391, 394–95 (1998). Including infertility within the PDA's protection as a "related medical condition[ ]" would result in the anomaly of defining a class that simultaneously includes equal numbers of both sexes and yet is somehow vulnerable to sex discrimination. Because such a result is incompatible with the PDA's purpose of clarifying the definition of "because of sex" and the Supreme Court's interpretation of the PDA in *Johnson Controls*, we hold that infertility standing alone does not fall within the meaning of the phrase "related medical conditions" under the PDA. Thus, even if we were to agree with Saks that the Plan provided inferior coverage for infertility, such inferior coverage would not violate the PDA.[4]

In sum, we find that, because the exclusion of surgical impregnation procedures disadvantages infertile male and female employees equally, Saks's claim does not fall within the purview of the PDA.

### D. Saks's Sex–Discrimination Claim

■ Having concluded discrimination based on infertility alone is not cognizable under the PDA, we now consider whether Saks has stated a claim for sex discrimination under Title VII on any other ground. Saks contends that the exclusion of coverage for surgical impregnation procedures violates Title VII because the actual procedure is performed on women and, therefore, the exclusion affects only female employees. Thus, according to Saks, the

---

**3.** In so concluding, we do not hold that a male employee cannot state a claim under the PDA. *See Newport News*, 462 U.S. at 678 & n. 14, 103 S.Ct. 2622; *see also id.* at 682, 103 S.Ct. 2622 (noting that both male and female employees are protected under Title VII). In *Newport News*, the Supreme Court recognized that male employees may state a claim under the PDA for limitations of the pregnancy-related benefits afforded their wives. *See id.* at 683–85, 103 S.Ct. 2622. However, in that opinion, the Court focused on the parity of benefits offered to male and female employees. Thus, where the insurance plan in question "provide[d] limited pregnancy-related benefits for [male] employees' wives, and afford[ed] more extensive coverage for employees' spouses for all other medical conditions requiring hospitalization," the Court concluded that "the plan unlawfully [gave] married male employees a benefit package for their dependents that [was] less inclusive than the dependency coverage provided to married female employees." *Id.* at 683–84, 103 S.Ct. 2622.

In addition, we do not preclude the possibility that a medical condition that is caused by pregnancy, but that also can occur independently in both men and non-pregnant women, such as diabetes, could be considered a "medical condition related to pregnancy."

**4.** We expressly decline to consider whether an infertile female employee would be able to state a claim under the PDA or Title VII for adverse employment action taken against her because she has taken numerous sick days in order to undergo surgical impregnation procedures. *See, e.g., Cleese v. Hewlett–Packard Co.*, 911 F.Supp. 1312, 1317–18 (D.Or.1995); *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393, 1401–02 (N.D.Ill.1994).

Plan violates Title VII by offering complete coverage for surgical infertility treatments for male employees but incomplete coverage for female employees.

In a different context the exclusion of surgeries that are performed solely on women from an otherwise comprehensive plan might arguably constitute a violation of Title VII, but here we are faced with the unique circumstance of surgical impregnation procedures performed for the treatment of infertility. Although the surgical procedures are performed only on women, the need for the procedures may be traced to male, female, or couple infertility with equal frequency. Thus, surgical impregnation procedures may be recommended regardless of the gender of the ill patient. For example, where a male suffers from poor sperm motility or low sperm count, resulting in his infertility, his healthy female partner must undergo the surgical procedure. In addition, treatment by surgical impregnation procedures requires the participation of both the male and the female partners. Because male and female employees afflicted by infertility are equally disadvantaged by the exclusion of surgical impregnation procedures, we conclude that the Plan does not discriminate on the basis of sex.

The Supreme Court's reasoning in *Newport News* supports this conclusion. In that case, the Supreme Court recognized that, although a policy that excluded ma-

ternity benefits for dependent children discriminates on the basis of pregnancy, "the exclusion affects male and female *employees* equally since both may have pregnant dependent daughters." *See Newport News*, 462 U.S. at 684 n. 25, 103 S.Ct. 2622. Similarly, in this case, the Plan's exclusion of surgical impregnation procedures does not provide male employees with more comprehensive coverage of infertility treatments than female employees because the surgical procedures in question are used to treat both male and female infertility.[5]

■■■ Saks contends that, regardless of the gender-neutral origin of the problem necessitating the procedures, the Plan's exclusion effectively targets only infertile women. In support of this contention, Saks makes a two-part argument. First, she maintains that the Plan implicitly restricts coverage to procedures performed directly on the ill patient. Under that implicit restriction, an infertile man who sought surgical impregnation of his healthy wife as a remedy for *his* infertility would be denied coverage. Second, Saks reasons that, because, under the implicit restriction, the Plan would not cover procedures performed on the infertile male employee's healthy wife, the explicit exclusion of coverage for surgical impregnation procedures limits only the Plan's coverage for treatment of a female employee's infertility.[6]

---

5. As noted previously, Saks has not offered any evidence from which a reasonable jury could conclude that the surgical impregnation procedures required for the treatment of male infertility differ from those required for the treatment of female infertility, or, more importantly, that male infertility is more frequently treated by other (Plan-covered) means than is female infertility.

6. Plaintiff does not argue, and we do not decide today, whether the Plan's exclusion of surgical impregnation procedures as applied

to infertile female employees who are unmarried violates Title VII or the PDA. With respect to unmarried employees, the Plan would appear to cover only those infertility treatments that are required to treat the infertility of the employee, not the employee's partner, and that are performed directly on the employee himself or herself. Hence, in these circumstances, by excluding certain infertility treatments that are performed on women only, an argument can be made that the Plan denies coverage for a subset of infertility treatments available to unmarried female em-

Without some evidence to support Saks's reading of the Plan to contain the implicit restriction, her argument is simply too speculative to defeat a motion for summary judgment. *See Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("Though we must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture or speculation by the [non-moving party] will not defeat summary judgment."). Saks has adduced no such evidence.

Saks's argument requires the Court to assume that, if the Plan did provide coverage for surgical impregnation procedures, it would refuse to cover surgical impregnation procedures to treat male infertility. There is nothing in the language of the Plan to support this interpretation. The Plan covers all "medically necessary" procedures unless specifically exempted. "Medically necessary" procedures are defined as "any service" required to treat an active illness. Thus, to the extent that Franklin Covey would consider surgical impregnation "medically necessary" to treat female infertility, the plain language of the Plan suggests that such procedures would also be considered "medically necessary" to treat male infertility.[7] Moreover, she does not offer any data suggesting that insurance companies that do cover surgical impregnation procedures do so only for female infertility, and not when the procedure must be performed on a healthy woman because of her partner's infertility. Without some evidence, Saks's argument is wholly speculative and, as

such, is insufficient to defeat Franklin Covey's motion for summary judgment.

Because the exclusion affects a procedure that is used to treat both male and female infertility (which occurs at similar rates across genders), this case is distinguishable from the authorities upon which Saks relies, namely, *Johnson Controls,* and a decision by the EEOC. In *Johnson Controls,* the Supreme Court held that Title VII was violated by an employer's fetal protection policy that required women to prove their inability to become pregnant as a prerequisite to job assignments involving actual or potential exposure to lead. *See* 499 U.S. at 190–92, 197, 111 S.Ct. 1196. In 2000, the EEOC concluded that an exclusion of prescription contraceptive drugs and devices in an otherwise comprehensive health care plan violated Title VII because prescription contraceptives, which are prescribed as birth control and for other medical purposes, are used solely by women. *See* Decision of the Equal Employment Opportunity Commission 1–2, 4–5 (Dec. 14, 2000) <www.eeoc.gov/docs/decision-contraception.html>. Whereas these cases involved a distinction based on the capacity to become pregnant and on the exclusion of oral contraceptives, both of which disadvantage women only, the exclusion of surgical impregnation techniques limits the coverage available to infertile men and infertile women and, thus does not violate Title VII. *See Johnson Controls,* 499 U.S. at 198, 111 S.Ct. 1196 (finding gender discrimination in fetal protection policy because it "classifies on the basis of gender

ployees while covering all infertility treatments available to unmarried male employees.

**7.** Saks relies heavily on the Plan's exclusion of coverage for the expenses of an organ donor to support her claim that only costs for ill patients are covered. This exclusion, how-

ever, is found only in the provision describing the specific coverage for organ transplants and thus is limited to that procedure. We do not interpret this particular exclusion as an expression of a general Plan policy of only covering procedures performed on ill patients.

and childbearing capacity, rather than fertility alone").

Because the Plan's exclusion of coverage for surgical impregnation procedures limits the infertility procedures covered for male and female employees equally, that exclusion does not violate Title VII.[8]

## II. ERISA Preemption

Finally, Saks contends that the district court erred in finding that Franklin Covey had not waived the defense that ERISA preempts Saks's state contract claims where that defense was raised for the first time in Franklin Covey's motion for summary judgment. She also argues that it would be an abuse of discretion for the district court to allow defendants to amend their answer to include the ERISA preemption defense after she filed a motion for summary judgment. In the alternative, for the first time on appeal, she requests leave to amend her complaint to add ERISA claims.

### A. Waivability of ERISA Preemption

Four circuits, as well as numerous state courts, have concluded that the defense of ERISA preemption in a benefits-due action may be waived if not timely raised. *See, e.g., Wolf v. Reliance Standard Life Ins. Co.,* 71 F.3d 444, 448–49 (1st Cir.1995) (citing state and federal cases); *Dueringer v. Gen. Am. Life Ins. Co.,* 842 F.2d 127, 129–30 (5th Cir.1988); *Gilchrist v. Jim Slemons Imps., Inc.,* 803 F.2d 1488, 1497 (9th Cir.1986); *Rehab. Rehabilitation Inst. of Pittsburgh v. Equitable Life Assurance Soc'y of the United States,* 131 F.R.D. 99, 101 (W.D.Pa.1990), *aff'd without op.,* 937 F.2d 598 (3d Cir.1991). In *International Longshoremen's Association v. Davis,* the Supreme Court made clear that preemption issues that dictate the choice of forum are jurisdictional and therefore may not be waived, but expressly stated that this rule does not extend to preemption issues that affect the parties' choice of law. *See Davis,* 476 U.S. 380, 390 & n. 9, 398–99, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986); *see also Wolf,* 71 F.3d at 448; *Gilchrist,* 803 F.2d at 1496–97. The circuits that have addressed the waiver issue have agreed that the converse of the *Davis* rule also holds: Where federal preemption affects only the choice of law, the defense may be waived if not timely raised. *See Wolf,* 71 F.3d at 448; *Piekarski v. Home Owners Sav. Bank, F.S.B.,* 956 F.2d 1484, 1489 (8th Cir.1992); *HECI Exploration Co. v. Holloway (In re: HECI Exploration Co.),* 862 F.2d 513, 521 & n. 13 (5th Cir.1988); *Dueringer,* 842 F.2d at 130; *Gilchrist,* 803 F.2d at 1497; *see also Mauldin v. WorldCom, Inc.,* 263 F.3d 1205, 1211 (10th Cir.2001) (declining to decide whether ERISA or state contract law governs dispute because neither party briefed issue); *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1212 (11th Cir.1999) (stating that ERISA preemption can constitute an affirmative defense to certain state law claims). We join our sister circuits in reaching the same conclusion.

ERISA's jurisdictional provision governing benefits-due actions provides concurrent jurisdiction in state and federal district courts, *see* 29 U.S.C. § 1132(a)(1)(B), (e)(1), and thus ERISA prescribes the choice of law, not jurisdiction. As a result, we find that ERISA preemption in a benefits-due action is a waivable defense. *See Wolf,* 71 F.3d at 448–49; *Dueringer,* 842 F.2d at 130; *Gilchrist,* 803 F.2d at 1497; *Rehab. Inst.,* 131 F.R.D. at 101. We note that other types of actions under ERISA are subject to the

---

8. Appellant also appeals the district court's decision on her New York Human Rights Law claim. Because, as she acknowledges, this claim is co-extensive with her Title VII and PDA claims, it must likewise fail.

exclusive jurisdiction of federal courts; thus, our analysis here is limited to ERISA preemption of benefits-due actions. *See* 29 U.S.C. § 1132(e)(1).

We next turn to the question of when an ERISA preemption defense must be raised in order to be timely. Rule 8(c) of the Federal Rules of Civil Procedure requires that a responsive pleading must set forth certain enumerated affirmative defenses as well as "any other matter constituting an avoidance or affirmative defense." Fed.R.Civ.P. 8(c). An affirmative defense is defined as "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true." Black's Law Dictionary 430 (7th ed.1999); *see also Wolf,* 71 F.3d at 449. It is well-established that, absent an express exception in ERISA, ERISA's preemption provision extinguishes a plaintiff's state contract claims if those claims "relate to" an employee benefit plan. *See Devlin v. Trans. Communications Int'l Union,* 173 F.3d 94, 101 (2d Cir.1999). Thus, we hold that ERISA preemption of state contract claims in a benefits-due action is an affirmative defense that is untimely, and therefore subject to waiver, if not pleaded in the defendant's answer. *See Wolf,* 71 F.3d at 449; *Dueringer,* 842 F.2d at 130; *Rehab. Inst.,* 131 F.R.D. at 101–02; 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1271 (1990).

Appellees argue that they suf- ficiently pleaded the ERISA preemption defense by asserting in their answer the general defense of failure to state a claim under Fed.R.Civ.P. 12(b)(6). We disagree. One of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice. *See Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434,

28 L.Ed.2d 788 (1971). A general asser- tion that the plaintiff's complaint fails to state a claim is insufficient to protect the plaintiff from being ambushed with an af- firmative defense. *See Wolf,* 71 F.3d at 450; *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan,* 11 F.3d 1567, 1571 (10th Cir.1993); *see also Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (holding that a general denial of allegations is insufficient to plead an affir- mative defense). Indeed, here Saks was left in the dark that the ERISA preemp- tion defense was in the offing until the motion for summary judgment.

Franklin Covey also argues that an ERISA preemption defense was in- voked in their answer by the statement that "[t]he exclusions ... challenged by Saks are within the Safe Harbor provision of Section 501(c) of the ADA." The safe harbor provision of the ADA provides, in part, that ERISA plans are generally not covered by the provisions of the ADA. *See* 42 U.S.C. § 12201(c)(3). Therefore, Franklin Covey's citation to the safe har- bor provision is reasonably understood as a defense only against Saks's ADA claim and not her other claims. Thus, we find no basis to conclude that Franklin Covey raised the ERISA preemption defense against the state law claims in its answer.

Notwithstanding a defendant's failure to timely plead the preemption de- fense, a district court may still entertain affirmative defenses at the summary judg- ment stage in the absence of undue preju- dice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futili- ty, or undue delay of the proceedings. *See Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 283 (2d Cir.2000), *cert. de- nied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000); *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993). In such circumstances, the district court

may construe the motion for summary judgment as a motion to amend the defendant's answer. *See Monahan,* 214 F.3d at 283; *Wolf,* 71 F.3d at 449. In this case, the district court stated that, "[w]ere it necessary, ... this Court would, in an exercise of its discretion, permit the defendants to amend their answer to assert ERISA preemption," but the district court never ruled on that issue. *See Saks,* 117 F.Supp.2d at 330. Saks has asked us to hold that allowing such an amendment would be an abuse of discretion. However, we think it would be inappropriate to reach that question in the absence of a definitive ruling. Accordingly, we remand to the district court to determine whether defendants' motion for summary judgment should be construed as a motion to amend the answer, and, if so, to rule on that motion. In light of the fact that we are remanding this issue to the district court, we decline to reach Saks's further request to amend her complaint in order to raise an ERISA claim. That request should be directed to the district court in the first instance.

We have carefully considered appellant's other arguments and find them to lack merit.

### CONCLUSION

For these reasons, the district court's judgment granting summary judgment in favor of Franklin Covey is affirmed in part and remanded in part. Costs shall be born by each party.