15-2474-cv
King v. Time Warner Cable Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

––––––––––

August Term, 2016

Argued: January 25, 2017; Decided: June 29, 2018

Docket No. 15-2474-cv

––––––––––

ARACELI KING,

*Plaintiff-Appellee,*

— v. —

TIME WARNER CABLE INC.,

*Defendant-Appellant.*

––––––––––

B e f o r e :

WINTER, CABRANES, and LYNCH, *Circuit Judges.*

––––––––––

Defendant-appellant Time Warner Cable Inc. ("Time Warner") appeals a decision by the district court (Alvin K. Hellerstein, *J.*) granting partial summary judgment in favor of the plaintiff-appellee Araceli King on her claim that Time Warner knowingly or willfully violated the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, by using an "automatic telephone dialing system" to call King's cell phone 153 times without her consent. The district court's

interpretation of the statute relied primarily on a Declaratory Ruling and Order issued by the Federal Communications Commission in 2015 that has since been invalidated by the D.C. Circuit. *See ACA Int'l v. FCC*, 885 F.3d 687, 699 (D.C. Cir. 2018). We now conclude that the district court's analysis was based on an incorrect interpretation of the statutory text. Accordingly, the district court's ruling in favor of King is VACATED and the matter is REMANDED for further proceedings consistent with this opinion.

———

STEPHEN TAYLOR (Sergei Lemberg, *on the brief*), Lemberg Law LLC, Wilton, CT, *for Plaintiff-Appellee*.

MATTHEW A. BRILL (Matthew T. Murchison and Alexandra P. Shechtel, *on the brief*), Latham & Watkins LLP, Washington, DC, *for Defendant-Appellant*.

———

GERARD E. LYNCH, *Circuit Judge*:

Defendant-appellant Time Warner Cable Inc. ("Time Warner") appeals a decision by the district court (Alvin K. Hellerstein, *J.*) granting partial summary judgment in favor of the plaintiff-appellee Araceli King on her claim that Time Warner knowingly or willfully violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, by using an "automatic telephone dialing system" to call King's cell phone 153 times without her consent. The district court's interpretation of the statute relied primarily on a Declaratory Ruling and Order issued by the Federal Communications Commission ("FCC") in 2015 that has since been invalidated by the D.C. Circuit. *See ACA Int'l v. FCC*, 885 F.3d 687,

2

699 (D.C. Cir. 2018). We now conclude that the district court's analysis was based on an incorrect interpretation of the statutory text. Accordingly, the district court's ruling in favor of King is VACATED and the matter is REMANDED for further proceedings consistent with this opinion.

## BACKGROUND

**I.    The Telephone Consumer Protection Act**

In the interest of reducing the volume of unwanted telemarketing calls, the Telephone Consumer Protection Act, in relevant part, makes it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service, . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii); *see also ACA Int'l*, 885 F.3d at 692–93. The statute defines an "automatic telephone dialing system" ("ATDS" or "autodialer") as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 42 U.S.C. § 227(a)(1). Aggrieved parties may bring suit to recover a minimum of $500 per violation, which sum can be trebled at the

3

court's discretion "[i]f the court finds that the defendant willfully or knowingly violated" the statute. *Id.* § 227(b)(3).

The FCC has the authority to promulgate regulations implementing the TCPA. *Id.* § 227(b)(2); *see also id.* § 201(b) (authorizing the FCC to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter"). In 2015, the FCC issued a Declaratory Ruling and Order that, among other things, attempted to clarify the TCPA's requirement that, to qualify as an autodialer under the statute, a device must have the "capacity" to dial random and sequential numbers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7973–74 (2015) [hereinafter "2015 Order"]. The Commission asserted that an expansive interpretation of the term "capacity" was consistent with both Congress's intent that the TCPA have a broad protective reach, and with the Commission's previous orders. *Id.* Accordingly, the FCC "declined to define a device's 'capacity' in a manner confined to its 'present capacity.' Instead, the agency construed a device's 'capacity' to encompass its 'potential functionalities' with modifications such as software changes." *ACA Int'l*, 885 F.3d at 693–94, quoting 2015 Order at 7974, 7976.

## II.     Factual Background for King's TCPA Claims

King contends that Time Warner violated the TCPA by making numerous calls to her cell phone using an autodialer after she had withdrawn her consent for it to do so.[1] During the period at issue in this lawsuit, King was a Time Warner customer. When signing up to receive services from Time Warner, King was required to agree to the company's terms of service, which included, in relevant part, granting the company permission to "call any number you provide to us (or that we issue to you) for any purpose," provided, however, that a customer could request to be placed on a "do not call" list so as not to receive any further calls "for marketing purposes," and that request would be honored. App. at 243. The terms of service agreement also specified that Time Warner "may use automated dialing systems or artificial or recorded voices to call" its customers. *Id.*

---

[1] Because the district court granted summary judgment in King's favor on the issue raised in this appeal, we must consider whether, drawing all reasonable inferences in Time Warner's favor, the record shows that there is no genuine dispute as to any material fact and that King is entitled to judgment as a matter of law. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017), as amended Aug. 21, 2017; Fed. R. Civ. P. 56(a). Accordingly, we state the facts here in the light most favorable to Time Warner.

Time Warner uses an "interactive voice response" calling system to, among other things, contact customers with overdue accounts. The system automatically references Time Warner's billing records to determine which customers are more than 30 days late on their payments, and then dials the number associated with those accounts. If a person answers the call, the system is programmed not to call that number again until the following day (and it will stop altogether if the customer's account becomes current). If the call is not answered, the system is programmed to leave a voicemail and attempt to call back two more times that day. Time Warner admits that its system has "the capacity to store numbers" and dial them, App. at 222, but asserts that it "does not have the capacity to make random or sequentially generated calls," *id.* at 221.

Beginning on July 3, 2013, Time Warner's system began making calls to a cell phone number belonging to King in an effort to collect on an overdue account. Unfortunately, King was not the customer Time Warner was seeking; instead, her phone number had erroneously been associated with the account of another, apparently delinquent, customer. King claims that, on October 3, 2013, after she had received ten calls from the system, she asked Time Warner to stop calling her number regarding the other customer's account. But the calls

6

continued unabated through January 7, 2014, when King again called Time Warner in another unsuccessful attempt to stop the calls, and beyond.[2] In total, Time Warner's system called King 163 times between July 2013 and August 2014.

In March 2014, King filed the instant suit, claiming that Time Warner's calls violated the TCPA. The parties cross-moved for summary judgment. Time Warner interpreted the term "capacity" in the TCPA's definition of an autodialer to mean that a device was "capable at the time of use" of performing the functions of an autodialer. App. at 265; *see also id.* at 266 (referring to a system's "present capacity"). Accordingly, it argued that, in the absence of any evidence that its system had the present ability to perform the requisite functions, its system could not qualify as an autodialer under the statute. The district court disagreed, because it adopted a broader understanding of the term "capacity." Relying on a press release announcing the FCC's 2015 Order, which was not formally issued until a few days after the court's ruling, the district court

---

[2] When opposing King's motion for summary judgment below, Time Warner disputed that King had made the October 3 and January 7 calls because it had no record of either exchange in its files. The district court determined that the absence of a record in Time Warner's files was insufficient to create a question of fact and therefore concluded that there was no material dispute that King had effectively withdrawn her consent to receive automated calls from Time Warner on October 3. Time Warner does not challenge that holding on appeal.

determined that the TCPA's definition of an autodialer included "any technology with the *capacity* to dial random or sequential numbers," such as "robo-callers," and concluded that Time Warner's system met that "low bar." *Id.* at 282 (emphasis in original). The court thus rejected as irrelevant Time Warner's contention that there was no evidence that its system "*actually* dialed King's number randomly or from a list," and did not investigate whether Time Warner's system had the current ability to perform the functions of an autodialer. *Id.* (emphasis in original).

The court also concluded that although King's assent to the company's terms of service constituted blanket consent to receive calls from an autodialer, she effectively withdrew that consent on October 3, 2013. Accordingly, the court granted summary judgment to Time Warner as to the ten calls made before King withdrew her consent, and granted summary judgment to King as to the 153 calls made thereafter. The court further held that, because Time Warner had knowingly violated the statute, treble damages were warranted for each of the violating calls.

Time Warner filed the instant appeal.

**III.** *The D.C. Circuit's Invalidation of the FCC's 2015 Order*

While Time Warner's appeal was being briefed to this court, the United States Court of Appeals for the District of Columbia Circuit heard a challenge to the FCC's 2015 Order.[3] In *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), that court decided in relevant part that the FCC's definition of "capacity" in the 2015 Order, which included a device's "potential functionalities" after modification, *id.* at 693–94, would allow the statute to extend well past what Congress intended, and that the 2015 Order therefore failed "the requirement of reasoned decisionmaking," *id.* at 703.

---

[3] Under the Hobbs Act, the courts of appeals "ha[ve] exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders" of the FCC that are reviewable under 47 U.S.C. § 402(a). 28 U.S.C. § 2342(1). When agency regulations are challenged in more than one court of appeals, as they were in the present case, 28 U.S.C. § 2112 requires that the multidistrict litigation panel consolidate the petitions and assign them to a single circuit. Challenges to the 2015 Order were assigned to the D.C. Circuit, which thereby became "the sole forum for addressing . . . the validity of the FCC's" order. *GTE S., Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999); *see also MCI Telecomms. Corp. v. U.S. W. Commc'ns*, 204 F.3d 1262, 1267 (9th Cir. 2000). After hearing argument in this case, we held the appeal in abeyance pending resolution of the challenges to the validity of the FCC's 2015 Order.

**DISCUSSION**

The district court's order granting in part King's motion for summary judgment is reviewed *de novo*. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017), as amended Aug. 21, 2017. As noted above, in concluding that Time Warner's calls to King violated the TCPA, the district court relied on the FCC's 2015 Order, which broadly construed the term "capacity" and thus extended the TCPA to reach any device that could be modified by software changes to perform the functions of an autodialer. In the wake of *ACA International*, which invalidated that Order and thereby removed any deference we might owe to the views the FCC expressed in it, we must decide independently whether the district court's broad understanding of the "capacity" a device must have in order to qualify as an ATDS under the TCPA is a supportable interpretation of the statute. We conclude that it is not. Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting "capacity" to include a device's "potential functionalities" after some modifications extends the statute too far. Instead, we agree with the D.C. Circuit that the term "capacity" is best understood to refer to the functions a device is currently able to perform,

10

whether or not those functions were actually in use for the offending call, rather than to devices that would have that ability only after modifications.

## I. "Capacity"

As discussed above, to qualify as an ATDS under the TCPA, a device must have the "capacity" to perform the functions of an autodialer. 47 U.S.C. § 227(a)(1)(A). Time Warner contends that "capacity" should be interpreted to mean a device's "present ability," rather than its potential capabilities after some unspecified software modifications. Appellant's Br. at 30 (emphasis omitted). King endorses the 2015 Order's determination that any device that could, if appropriately modified, perform autodialer functions should be construed to have that capacity. *See* Appellee's Br. at 22–23.

"Every exercise in statutory construction must begin with the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003). The words to be interpreted are not considered in isolation; rather, we "look[] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute." *Id.* "If resorting to the plain text alone fails to resolve the question, we test the competing interpretations against both the statutory structure of the

11

[TCPA] and the legislative purpose and history of [§ 227(a)(1)]." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 6 (2d Cir. 2017).

A.      *The "Plain Meaning" of "Capacity"*

Definitions of the word "capacity" from dictionaries contemporaneous with the passage of the TCPA do little to definitively rule in or rule out Time Warner's proposed interpretation.[4] Some of those definitions invoke an abstract sense of potential — i.e., the capacity of mankind to make world-changing inventions, or the capacity of one person for "greatness." Others aim at something more concrete and immediate — for instance, when one is looking to hire an employee with the capacity to perform certain engineering tasks, qualified applicants presumably will not include people who don't yet have an

---

[4] The 1993 edition of *Webster's New World Dictionary* offers "the ability to contain, absorb, or receive and hold" (first definition), and "the ability or qualifications (*for*, or *to* do, something)" (fourth definition, emphasis in original), both of which seem to refer to a *present* ability to do those things; however, it also includes a definition more consistent with the FCC's proposed interpretation: "the quality of being adapted (*for* something) . . . ; capability; potentiality" (sixth definition, emphasis in original). The 1991 edition of the *Oxford English Dictionary* offers a similarly ambiguous selection, including the "[a]bility to receive or contain" (first definition); "[t]he power, ability, or faculty for anything in particular" (sixth definition); and "[t]he quality or condition of admitting or being open to action . . . ; capability; possibility" (seventh definition).

engineering degree (even those who may get one eventually), but may include degreed engineers who require additional instruction to get up to speed.

Common sense suggests that legislation, which typically targets present social problems, would be aimed at devices that have the "capacity," in that narrower sense, to cause the problem that is the subject of legislative concern, rather than addressing itself to the hazily defined universe of things that have only a theoretical potential to do so. That is so not least because a broader sweep is unnecessary to effect the legislators' protective purpose: in the context of the TCPA, for instance, devices with only the theoretical potential to perform the functions of an autodialer must necessarily obtain that actual ability before they pose a concrete risk of causing the problems which the statute was enacted to prevent. Based on the plain meaning of the statutory text, therefore, we are inclined to adopt a narrower definition of "capacity" than the one the FCC endorsed in its 2015 Order.

B.    *The D.C. Circuit's Opinion*

In *ACA International*, the D.C. Circuit rejected the FCC's broad interpretation of "capacity" as inconsistent with the legislative purposes behind the TCPA, and concluded, as do we, that a narrower definition would be

13

appropriate. It first determined that Congress did not intend the statute to reach as far as the FCC's interpretation would permit. Defining "capacity" to include "features that can be added . . . through software changes or updates," as the FCC's 2015 Order did, 2015 Order at 7974 n.63, would extend the TCPA to reach to every smartphone that could be programmed to make automatic calls through a simple app download, with the result that every unwanted call to a cell phone from such a device could subject the caller to a $500 minimum statutory penalty — regardless of whether an autodialer feature was ever actually downloaded, let alone used, *ACA Int'l*, 885 F.3d at 697. As the D.C. Circuit pointed out, that outcome "would extend a law originally aimed to deal with hundreds of thousands of telemarketers into one constraining hundreds of millions of everyday callers." *Id.* at 698. It therefore rejected the FCC's interpretation as an impermissible expansion of the statute's intended reach. *Id.* at 699. We agree that the consequences of the FCC's (and, by extension, King's) interpretation effectively disqualify it as a plausible reading of the statutory language.

In reaching that conclusion, however, the D.C. Circuit did not unequivocally adopt the view of the petitioners in that case (and of Time Warner here) that the term "capacity" was clearly limited to a device's "present ability."

It observed that "[v]irtually any understanding of 'capacity' . . . contemplates some future functioning state, along with some modifying act to bring that state about." *Id.* at 696. That analysis seems consistent with Congress's decision not to define a qualifying autodialer in terms of whether its autodialing functions were, in fact, in use during the offending call. But rejecting a narrow focus on the present "use" of the device is not an invitation to expand the statute's reach to the limits of a device's technological potential. Instead, the D.C. Circuit proposed:

> whether equipment has the 'capacity' to perform the functions of an ATDS ultimately turns less on labels such as 'present' and 'potential' and more on considerations such as how much is required to enable the device to function as an autodialer: does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?

*Id.*

Although the D.C. Circuit was deciding only whether the FCC's specific interpretation was a reasonable one, rather than announcing what that court itself deemed to be the *best* interpretation of the statute, its analysis informs our understanding of the statutory text. We view the D.C. Circuit's discussion as correctly drawing a distinction between a device that currently has features that enable it to perform the functions of an autodialer — whether or not those

15

features are actually in use during the offending call — and a device that can perform those functions only if additional features are added. We find that distinction persuasive; accordingly, we would conclude that the former category of devices falls within the definition of an ATDS, and the latter does not.[5] *See Herrick v. GoDaddy.com LLC*, No. CV-16-00254-PHX-DJH, 2018 WL 2229131, at *6 (D. Ariz. May 14, 2018) (concluding that *ACA International*'s reasoning directs courts to determine "'how much' would be required to enable such capacity"); *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1196 (W.D. Wash. 2014) (in a case predating the 2015 Order, rejecting the argument that "a system that has to be reprogrammed or have new software installed in order to perform the functions of an ATDS [is] an ATDS").

C.    *Legislative History of "Capacity"*

Finally, the TCPA's ambiguous legislative history regarding the use of the term "capacity" does not cast doubt on the interpretation of the term we derive

---

[5] The Third Circuit recently reached essentially the same conclusion in *Dominguez v. Yahoo, Inc.*, – F.3d –, 2018 WL 3118056 (3d Cir. June 26, 2018), holding that, following the D.C. Circuit's ruling in *ACA International*, in order for his TCPA claim to survive, the plaintiff in that case had to demonstrate that the defendant's equipment "had the present capacity to function as an autodialer." Slip op. at 7; *see also id.* at 9 n.23.

16

from the statute's text and purpose. Admittedly, that history does not unequivocally support our narrower interpretation, but neither does it clearly foreclose it. Indeed, it is somewhat supportive of our reading to the extent that Congress expressed concerns about the statute's potential for overreach if a broader definition was used.

The House Committee on Energy and Commerce, which was responsible for reviewing and presenting in the first instance the bill that would become the TCPA, certainly recognized that the term "capacity" had some potential for expansiveness, and, indeed, seems to have selected the word partially on that basis. During the Committee's hearings, industry representatives expressed concern that the term "capacity" would allow the statute to reach too broadly and specifically advocated for the definition of an ATDS to focus instead on the actual "use" of a device. *See Telemarketing Practices: Hearing before the Subcomm. on Telecomms. & Finance of the H. Comm. on Energy & Commerce on H.R. 628, H.R. 2131, & H.R. 2184*, 101st Cong. 110–11 (1989) (letter from Tracy Mullin, Senior Vice President of Gov't Affairs, Nat'l Retail Merchs. Ass'n); *see also Telemarketing/Privacy Issues: Hearing Before the Subcomm. on Telecomms. & Finance of the H. Comm. on Energy & Commerce on H.R. 1304 & H.R. 1305*, 102d Cong. 107

(1991) (statement of Richard A. Barton, Senior Vice President for Gov't Affairs, Direct Mktg. Ass'n.). The Committee's report rejected that option, observing that the proposed definition of an ATDS included both "equipment which is designed or intended to be used to deliver automatically dialed prerecorded messages" and "equipment which has the 'capability' to be used in such manner."[6] H. Rep. No. 101-633, at 6 (1990).

The legislative history thus confirms what the language of the statute makes clear in any event: that the TCPA applies to calls from a device that *can* perform the functions of an autodialer, regardless of whether it has actually done so in a particular case.[7] The history is less clear, however, about the issue here:

---

[6] The House version of the bill under consideration in the Report, like the statute ultimately enacted, used the word "capacity" rather than "capability." H. Rep. No. 101-633, at 11. It appears that the Committee used the latter word inadvertently in the passage quoted in the text.

[7] In the same vein, in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), the Ninth Circuit recognized that the definition of an ATDS in the enacted version of the TCPA swept more broadly than a device's present use precisely because the statute used the term "capacity": to be a qualifying ATDS, that court explained, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Id.* at 951; *see also In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1261 (S.D. Cal. 2012) (describing *Satterfield* as "confirm[ing] that the statute creates liability based solely on a machine's capacity rather than on whether the capacity is utilized").

18

whether a device should be regarded as having the capacity to perform such functions only if it has the present ability to do so, or should be so regarded if the device *could* gain that ability if it were modified, such as by changes to its software.

The House Committee's Report acknowledged concerns that the definition of an ATDS could potentially be read broadly to "cover the mere ownership of office computers which are capable, perhaps when used in conjunction with other equipment, of delivering automated messages." H. Rep. No. 101-633, at 6. But instead of responding to those concerns by explicitly narrowing the definition, the Committee asserted that, even if such a broad reading prevailed, the statute would not regulate an unduly expansive category of equipment in any event, because the bill placed restrictions only on the "active 'use' [of an ATDS] to deliver automatically dialed *prerecorded* telephone solicitations without live operator intervention." *Id.* at 6–7 (emphasis added).

The Committee's proposed solution was incomplete. The Committee apparently failed to consider that even the version of the bill then under consideration also prohibited the use of an ATDS "to make unsolicited calls . . . to any number assigned to a paging or cellular telephone service," apparently

19

regardless of whether the call involved the use of a prerecorded voice. *Id.* at 11–12. The enacted version of the statute exacerbated that problem: it retains largely the same definition of an ATDS,[8] but now restricts — as separate categories — calls made to cell phones without prior consent using *either* "any automatic telephone dialing system *or* an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added). Nevertheless, the Committee's effort to suggest that the statute's reach would be limited in response to concerns of overbreadth, rather than endorsing the broader view, suggests that Congress was troubled by the possibility that the TCPA could be read to restrict calls from every device that could somehow be converted into an autodialer.

The legislative history thus provides no definitive assistance in resolving the issue before us, and it certainly tells us nothing that would foreclose what we view as the best interpretation of the term "capacity" in the context of this statute, which we believe is a narrower one focusing on a device's current functions.

_____

[8] In addition to having the capacity to store or produce certain numbers and dial them, the House bill also required a qualifying ATDS to have the capacity "to deliver, without initial live operator intervention, a prerecorded voice message to the number dialed, with or without manual assistance." H. Rep. No. 101-633, at 11. The third requirement was omitted from the enacted version of the statute. *See* 47 U.S.C. § 227(a)(1).

*\* \* \**

In sum, we conclude that the term "capacity" in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software. That definition does not include every smartphone or computer that might be turned into an autodialer if properly reprogrammed, but does include devices whose autodialing features can be activated, as the D.C. Circuit suggested, by the equivalent of "the simple flipping of a switch." *ACA Int'l*, 885 F.3d at 696. Within those bounds, however, courts may need to investigate, on a case-by-case basis, how much is needed to activate a device's autodialing potential in order to determine whether it violates the TCPA.

Applying those principles in the present case, we conclude that the district court's grant of partial summary judgment relied on an incorrect interpretation of the statute that was in turn premised on deference to an FCC Order that is no longer valid. The record does not permit us to conclude, as a matter of law, that Time Warner's system has the requisite "capacity," as we understand it, to meet the definition of an autodialer regulated by the TCPA. Nor does it permit us to conclude the opposite. On the present record, we do not know whether Time

21

Warner's system had the ability to perform the functions of an ATDS when it made the calls to King, nor what kinds of modifications might be required to permit it to do so. Accordingly, the matter is remanded to the district court to take up those questions in the first instance.

## II. Other Issues

The parties have raised several additional arguments that were not resolved by the prior district court order and that the court may need to consider on remand. First, Time Warner argues that the district court's reading of the statute would render its "random or sequential number generator" clause superfluous. The district court's ruling does not address that question. To the contrary, the district court stated that "[w]hether [Time Warner] *actually* dialed King's number randomly or from a list is irrelevant" because its system had the "*capacity* to dial random or sequential numbers," under the FCC's expanded definition of that term. App. at 304 (emphasis in original, internal quotation marks omitted). In *ACA International*, the D.C. Circuit noted that "the role of the phrase, 'using a random or sequential number generator,' has generated substantial questions over the years," which the FCC's 2015 Order failed to conclusively resolve. 885 F.3d at 701. To the extent that applying the narrower

definition of "capacity" that we adopt today necessitates that those complicated questions be answered in the present case, we leave it to the district court to address them in the first instance.

Second, Time Warner argues that the district court improperly relied on a "human involvement" standard that is not reflected in the statute. Appellant's Br. at 27. We note that the FCC expressly declined to adopt such a standard in its 2015 Order. *See* 2015 Order at 7976. And it is unclear whether the district court intended to present the lack of human involvement in Time Warner's calls to King as an alternative basis for its ruling because it cites no authority for reading that standard into the statute. Given those uncertainties, we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims.

In light of the technological complexities inherent in the application of the statute to different types of devices, software programs, and "systems," and the lack of clarity in the record as to the precise mechanisms constituting the Time Warner system that produced the calls to King, it seems prudent to limit our pronouncements in this case. Accordingly, we hold only that the district court decision was in error because (1) that decision was, understandably, based on

deference to an administrative interpretation of the statute that has now been invalidated, and (2) when we consider the meaning of the statute independently, without an administrative interpretation to defer to, the best interpretation of the statutory language is the one suggested by the D.C. Circuit's discussion in *ACA International*: in the TCPA's definition of an autodialer, a device's "capacity" refers to its current functions absent additional modifications, regardless of whether those functions were in use during the offending call. We leave it to the district court in the first instance to develop the factual record in this case and to apply the appropriate standard to the facts that emerge.

## CONCLUSION

For the reasons stated above, the judgment of the district court is VACATED, and the matter is REMANDED for further proceedings consistent with this opinion.